UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUSSELL JARVIS; JAMES JARVIS; ROBERT CRAMPTON; and COMMONWEALTH SECOND AMENDMENT, INC.,<br><br>           Plaintiffs,<br><br>-against-<br><br>VILLAGE GUN SHOP, INC. d/b/a VILLAGE VAULT; and SECRETARY MARY E. HEFFERNAN, in her Official Capacity as Secretary of the Executive Office of Public Safety and Security,<br><br>           Defendants. | CIVIL ACTION NO.<br>1:12-cv-40032 |

## DECLARATION OF JAMES JARVIS

I, James Jarvis, declare as follows:

1. I am a Plaintiff in the above-captioned action. I reside in Cheshire, Massachusetts. I am 48 years of age, and I am competent to testify on my own behalf.

2. I am the son of Russell Jarvis, who is also a Plaintiff in this action. James Jarvis, Jr., who is not a Plaintiff, is my son.

3. My hobbies include hunting, shooting, and firearms. I previously owned 3 shotguns, 4 rifles, 1 handgun, 1 "black powder" (or primitive) rifle, and ammunition, which I stored in a locked gun cabinet at my former home in Cheshire, Massachusetts.

4. Specifically, I owned and stored the following guns:

    i. Ithaca 12 gauge shotgun, model 37, serial no. 144495;

    ii. Mosin-Nagant 7.62x54R caliber rifle, 1915 model, serial no. 15926;

    iii. Ithaca 16 gauge shotgun, model 37, serial no. 559187-4;

      iv.     Remington .22 caliber rifle, model 572, no serial number;

      v.     Winchester 12 gauge shotgun, model 1300, serial no. L3559300 (with scope);

      vi.     Phoenix .22 caliber pistol, model HP22, serial no. 4099923;

      vii.     Stevens .22 caliber rifle, Marksman model, serial no. 78932;

      viii.     Thompson-Center .54 caliber black powder rifle, serial no. 59835; and

      ix.     Break-action underlever .32 caliber single-shot rifle, unknown manufacturer and serial number, from the 1800s.

5.     I am not positive of the serial number of the .54 caliber Thompson-Center black powder rifle, as discussed in further detail below, but I reasonably believe that the serial number was 59835.

6.     I currently hold a License to Carry Firearms ("LTC") issued pursuant to M.G.L. c. 140, § 131. A copy of my LTC is attached as Exhibit 1. My LTC expired one month ago, and I am in the process of renewing it.

7.     As detailed later, my LTC was suspended in July 2010, but police restored my LTC to valid status in 2011.

8.     I am divorced. I separated from my former wife in July 2010. Up until the time of our separation, I had lived with my wife in our family home in Cheshire, Massachusetts.

9.     I stored my guns and ammunition in a locked gun cabinet in our home in Cheshire.

10.     In addition, my father (Plaintiff Russell Jarvis) also stored a number of his own guns and ammunition in the locked gun cabinet.

11.     Finally, my son James Jarvis, Jr. also stored his own guns and ammunition in the locked gun cabinet.

-3-

12. When I separated from my wife in July 2010, I moved to my father's home in Adams, Massachusetts. At that time, I left all of the guns and ammunition in the locked gun case, as well as other items of property that I intended to retrieve later.

13. At the time that I was moving out of the Cheshire house, my former wife contacted the police and reported an argument that had taken place between us.

14. My former wife obtained an *ex parte* temporary order of protection on (or about) July 9, 2010.

15. On this same date, I was taken into custody by Massachusetts State Police, served with a copy of the restraining order, and released. I was never charged with any crime.

16. Approximately one month later, in August 2010, the order of protection against me was extended for one year.

17. The order of protection against me expired in the year 2011. I have not since been subject to an order of protection.

18. Massachusetts State Police came to my former home in Cheshire on the evening of July 9, 2010 and took custody of all of the guns and ammunition from the locked gun cabinet (including those listed above), as well as accessories such as cases and scopes. I know this because when the State Police took me into custody on July 9, there were two police cruisers, and the second cruiser contained the guns and other items that had (up until that night) been stored in Cheshire. I later watched State Police officers carry some of the guns and other items out of the second police car and into the State Police barracks.

19. State Police also seized 2 air (or "BB") guns and 3 "black powder" (or primitive) guns that had been left in the gun cabinet. The air guns operated on the basis of compressed air, and not on the basis of the explosion or combustion of propellants. The black powder guns were

not capable of firing fixed (cartridge) ammunition. I owned one of the black powder guns, as detailed previously. My son James owned another of the black powder guns, and my father Russell owned the third black powder gun.

20. State Police also took custody of various accessories for the guns, including scopes, slings, and cases. These items belonged to me, and also to my father Russell and my son James.

21. I jointly owned and used the ammunition along with my father Russell and my son James.

22. I first learned that Defendant Village Gun Shop, Inc. or "Village Vault" had custody of our guns and other property from my father. We received a letter from Village Vault on August 18, 2010. A copy of this letter is attached as Exhibit 2.

23. I did not know that the State Police would transfer our guns and other items to Village Vault.

24. Had I known in advance, I would have objected to the transfer to Village Vault, and I would have pursued other options, such as transferring the guns to a friend, proposing a different "bonded warehouse," or attempting to negotiate my own terms with Village Vault.

25. Also included with the Exhibit 2 letter was a list of the guns and other items that Village Vault had taken into its custody. This is included with Exhibit 2.

26. The entries for numbers 30 and 31 (on the Exhibit 2 list) are inaccurate in that they indicate one Thompson-Center .50 caliber black powder rifle with three numbered barrels, and one Thompson-Center .54 caliber black powder rifle without any serial number. However, there was actually one Thompson-Center .50 caliber black powder rifle with two barrels (which my father Russell owned), and one Thompson-Center .54 caliber black powder rifle with one

barrel (which I owned). Based on paperwork my father located, it appears that the serial number of my .54 caliber rifle was 59835. It appears that the person preparing the list erroneously listed the barrel for the .54 caliber rifle as being an accessory to the .50 caliber rifle.

27. Another apparent mistake in the list attached as Exhibit 2 is that it does not include the .32 caliber break-action, single-shot rifle that I had stored in the Cheshire gun cabinet, listed in the above paragraph 4(ix).

28. On the same day we received the Exhibit 2 letter, I understand that my father Russell called Village Vault. Later that same day, when I came home from work, I also contacted Village Vault. I spoke with a woman who told me that she could not tell me the amount of the fees, but that I could call the next day and speak with the owner.

29. I called Village Vault either the next day or the day after and spoke with a man. He told me that aside from paying their general fees for storing the guns, we would also need to pay a "transfer" or "paperwork" fee of $45 per gun to transfer the guns to my father Russell in order to pick them up. I told the man that my father and son owned most of the guns so they did not need to be "transferred." The man at Village Vault said that this did not matter because State Police had seized the guns from me.

30. I could not afford to pay Village Vault's fees, and so I was not able to transfer the guns and other property to another person. I was going through a divorce at the time, and legal fees and related costs had consumed my financial resources.

31. I did make two attempts to transfer the guns away from Village Vault. First, I spoke with Dave's Sporting Goods in Pittsfield, Massachusetts, which is a licensed gun shop. They told me that they had previously provided "bonded warehouse" services for the State Police, but that Village Vault had subsequently obtained the exclusive right to store all guns that

State Police seize. Dave's Sporting Goods told me that they would have charged us about $30 per month if State Police had sent our guns to them for storage. They also said that they would be willing to store our guns for this same amount if we had them transferred to Dave's. We could not afford to pay Village Vault's storage and other fees (now several thousand dollars) so we did not transfer the guns to Dave's. This conversation occurred in early 2011.

32. I also thereafter spoke with Tom Decker of Pete's Gun Shop in Adams, Massachusetts. Pete's Gun Shop is also a licensed gun dealer, and it also used to provide "bonded warehouse" services for the State Police. Because I know Tom personally, he agreed to pick up all of the guns from Village Vault for free, to return my father's guns and my son's guns to them, and to help me sell the other guns to help pay off the Village Vault fees. However, when we contacted Village Vault, the fees need to "transfer" and redeem the guns were about $2,700. Tom told me that we would probably lose money if we paid this much to retrieve the guns. We therefore decided not to pursue this option.

33. Village Vault sent me invoices from September 2010 ($1,065) through April 2011 ($4,550). Copies of invoices are attached as Exhibit 3.

34. In late 2011, I received correspondence that Village Vault had auctioned the guns and other property on May 21, 2011 and September 24, 2011 for the sum of $2,695. A copy of this correspondence is attached as Exhibit 4.

35. I never received any notice that I had the opportunity for a hearing to challenge the fees imposed by Village Vault or the validity of Village Vault's ongoing possession of my property.

I affirm all of the foregoing statements under penalty of perjury under the laws of the United States of America.

Dated: May 29 2013

_____
James Jarvis