UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RUSSELL JARVIS; JAMES JARVIS; ROBERT CRAMPTON; and COMMONWEALTH SECOND AMENDMENT, INC., <br><br> Plaintiffs, <br><br> -against- <br><br> VILLAGE GUN SHOP, INC. d/b/a VILLAGE VAULT; and SECRETARY ANDREA CABRAL, in her Official Capacity as Secretary of the Executive Office of Public Safety and Security,[*] <br><br> Defendants. | ) CIVIL ACTION NO. <br> ) 1:12-cv-40032-JLT <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## DEFENDANT SECRETARY OF PUBLIC SAFETY'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST VILLAGE GUN SHOP, INC. d/b/a VILLAGE VAULT

David R. Marks
Assistant Attorney General
Office of the Attorney General
BBO No. 548982
One Ashburton Place, Room 2019
Boston, MA 02108-1698
(617) 963-2362
Facsimile:  (617) 727-5785
david.marks@state.us.ma

---

[*]Under Fed. R. Civ. P. 25(d), Andrea Cabral, as the successor in office, is substituted as a party.

TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

LEGAL FRAMEWORK ......................................................................................2

UNDISPUTED MATERIAL FACTS ..................................................................5

ARGUMENT ........................................................................................................8

   I.   Plaintiffs Received All The Process Due When Their Guns Were Taken
        Into Police Custody; Thereafter The Statute Governing Storage Informed
        The Owners of How The Guns Would Be Disposed And Their Right
        To Sell or Transfer The Guns ...................................................................8

   II.  After the Police Take Custody of Firearms, And the Owner Fails to Arrange
        For Sale or Transfer of the Guns, No Additional Due Process Protections
        Attach to The Procedures Provided by Section 129D. ............................13

CONCLUSION....................................................................................................20

INTRODUCTION

In this case, the plaintiffs argue that certain actions taken by Village Vault under Mass. G. L. c. 140, § 129D deprived plaintiffs of their rights to due process.  The defendant Secretary of the Executive Office of Public Safety and Security ("Secretary"), submits this memorandum in opposition to the plaintiffs' motion for partial summary judgment.

The facts can be summarized as follows.  Two of the plaintiffs, James Jarvis and Robert Crampton, had in their homes various firearms and related accessories and ammunition. Separate police departments took custody of those items because the plaintiffs lost the legal right to possess or carry guns.  Court hearings were held, or were available, for plaintiffs to contest the loss of their firearms licenses and the surrender of the guns to the police.  Plaintiffs do not challenge those actions in this case.

Thereafter, under G. L. c. 140, § 129D, the police departments maintained custody of the guns for a period of time and then transferred the guns for storage and safekeeping to Village Vault, a bonded warehouse, licensed and authorized to store firearms and ammunition, at the owners' expense.  Ultimately, when each plaintiff failed to pay the outstanding storage fees, Village Vault, following the procedures in § 129D, auctioned off the guns to pay several months of arrearages plaintiffs owed.

The plaintiffs claim that transfer of their guns to the storage facility was without notice, and the auctioning of their guns due to their payment defaults, without a hearing, violated their constitutional rights to due process, even though they received invoices and notice of the sales. The plaintiffs now move for partial summary judgment against Village Vault, seeking damages from Village Vault, based on their due process claim.  Since the motion for partial summary judgment is premised on a claim that the procedures in G. L. c. 140, § 129D are unconstitutional,

the Secretary submits this memorandum in opposition, with a Statement of Material Facts.

The plaintiffs do not claim any due process violations in the initial surrender of their guns and ammunition to the police and in the police maintaining custody of the property, until the transfer to Village Vault. The plaintiffs claim only that due process was violated when the police transferred their guns to Village Vault for storage and when Village Vault auctioned the guns to pay unpaid storage fees without providing a hearing in advance. Because the plaintiffs were given all the process that was due under the constitution, their motion should be denied.

## LEGAL FRAMEWORK

In general, in Massachusetts, in order to possess or carry a firearm and/or ammunition, a person must be issued a firearms identification card ("FID card") or a license to carry firearms. An FID card "allows the holder to own, transfer, or possess a firearm in his residence or place of business," under G. L. c. 140, §§ 129B, 129C. Commonwealth v. Gouse, 965 N.E.2d 774, 785 n.14 (2012). A license to carry firearms generally allows the license holder to possess and carry firearms in public, beyond the licensee's residence or place of business. G. L. c. 140, § 131.[1] A licensing authority may suspend or revoke a license or FID card under circumstances defined by statute. See G. L. c. 140, §§ 129B, 131(d) and (f). Similarly, a license or FID card becomes invalid if it expires, and is not renewed within a certain time. G. L. c. 140, §§ 129B, 131(i).

If a license or FID card is revoked or suspended the holder must immediately surrender all firearms and ammunition in his possession to the licensing authority (usually the police department) where he resides, and a police officer is authorized to confiscate a revoked or suspended license or FID card and any firearms thereby unlawfully possessed. See G. L. c. 140,

---

[1] On August 11, 2014, the Governor signed comprehensive legislation amending the Commonwealth's gun laws in many respects. St. 2014, Ch. 284. Since many of the amendments will be phased in over time, this memorandum will focus on the provisions in effect at the time of the events at issue.

2

§§ 129B(12), 131(m) (requiring compliance with provisions of G. L. c. 140, § 129D).  Similarly,

if a court issues an abuse prevention order against a defendant, under G. L. c. 209A, §§ 4 or 5,

who has been shown to present a substantial likelihood of immediate danger of abuse, the

defendant must surrender to the police all firearms licenses, firearms and ammunition "which he

then controls, owns or possesses."  G. L. c. 209A, § 3B (requiring compliance with G. L. c. 140,

§ 129D).  A person aggrieved by the suspension or revocation of his FID card or license may

petition for judicial review in the state District Court and is entitled to an evidentiary hearing.  G.

L. c. 140, §129B(5); c. 140, § 131(f).  And, if firearms have been surrendered upon the issuance

of an abuse prevention order, the defendant may petition the court for review under G. L. c.

209A, §3B, and a hearing will be held within ten business days of the filing of the petition.

The surrender of firearms to law enforcement officials are governed by the procedures in

G. L. c. 140, § 129D.  Although the licensee must initially surrender his firearms to the police (or

licensing authority), he may later transfer or sell the firearms to another licensed person.  In

particular, he "shall have the right, at any time up to one year after [the] delivery or surrender, to

transfer such firearms, rifles, . . . and upon notification in writing by the purchaser or transferee

and the former owner, the licensing authority shall within ten days deliver such firearms, . . .  to

the transferee or purchaser."  G. L. c. 140, § 129D.

The statute does not require the police department to store the owner's property itself, if

the owner does not otherwise arrange for sale or transfer.  Rather, the police, "after taking

possession of any [guns] . . . or ammunition . . ., may transfer possession of such weapon for

storage purposes to a federally and state licensed dealer of such weapons and ammunition who

operates a bonded warehouse on the licensed premises that is equipped with a safe for the secure

storage of firearms and a weapon box or similar container for the secure storage of other

3

weapons and ammunition; . . . .   G. L. c. 140, § 129D.  A dealer taking possession of a weapon must "(i) inspect such weapon; (ii) issue to the owner a receipt indicating the make, model, caliber, serial number and condition of each weapon so received; and (iii) store and maintain all weapons so received in accordance with such regulations, rules or guidelines as the secretary of the executive office of public safety may establish under this section."  Id.  In return, "[t]he owner shall be liable to such dealer for reasonable storage charges and may dispose of any such weapon as provided under this section by transfer to a person lawfully permitted to purchase or take possession of such weapon."  Id.

        The statute provides for disposition, by alternative methods, of the weapons if the owner fails to arrange for transfer or sale to another legally authorized person and one year has passed from the date of surrender, or the owner has not paid storage charges for over 90 days.  If one year has passed, the owner has not arranged for sale or transfer of the weapons, and the licensing authority has maintained possession of the weapons, they "shall be sold at public auction by the colonel of the state police to the highest bidding person legally permitted to purchase and possess [the guns] . . ., and the proceeds shall be remitted to the state treasurer."  G. L. c. 140, § 129D.  A weapon stored and maintained by a licensed dealer "may be so auctioned at the direction of . . . the licensing authority at the expiration of one year following the initial surrender" to the licensing authority, with title passing to the licensed dealer for purposes of transferring ownership and, after deduction and payment for storage charges and costs associated with surrender and transfer, all surplus proceeds shall be immediately returned to the weapon's owner. Id.  Finally, the dealer then in possession may auction the weapons "if the storage charges for such weapon have been in arrears for 90 days," subject to the statute's other provisions.  Id.

## UNDISPUTED MATERIAL FACTS

James Jarvis was issued an FID card in 1980 in Adams, Massachusetts and continuously had it in effect, with the exception of one roughly four-year period, until it was suspended in July 2010.  (By operation of law, Jarvis's FID card expired on March 23, 2000, and he did not have it reinstated until October 13, 2014.)  (Deft's Stmt. ¶ 2.)[2]  In addition, Jarvis had a License to Carry Firearms issued on November 28, 2007 by the Cheshire Police Department.  (Deft's Stmt. ¶ 3.) Russell Jarvis was first licensed to have firearms in 1955.  (Deft's Stmt. ¶ 4.)  Russell Jarvis has held a valid license to carry issued under G. L. c. 140, § 131, since that time, with the exception that this license expired on December 8, 2006, and he did not obtain a new license until July 28, 2010.  (Deft's Stmt. ¶ 4.)  They both are aware of the state laws governing gun use and possession.  (Deft's Stmt. ¶ 15.)

In approximately 2004 or 2005, James Jarvis built a gun cabinet in his house in Cheshire, Massachusetts.  (Deft's Stmt ¶ 5.) Jarvis, his father Russell, and his son James A. Jarvis, II all stored their guns in the cabinet and each of them had free access and permission to take and use any of the guns, sharing them all.  (Deft's Stmt. ¶ 5.)

In the morning of July 9, 2010, Massachusetts State Police Troopers arrested James Jarvis for assault and battery on his wife, Lisa Jarvis.  As a result, the North Adams District Court, at 1:00 a.m. on July 9, 2010, issued an emergency restraining order against James Jarvis not to abuse his wife, not to contact her, to leave and stay away from their residence.  As a result of this order, that same morning, the State Police seized the over 30 firearms, ammunition and

---

[2] The following references will be used herein:  the Plaintiffs' Statement of Undisputed Material Facts will be "(Pltfs' Stmt.¶ # );" the Defendant Secretary Andrea Cabral's Statement of Undisputed Material Facts And Response to Plaintiffs' Statement of Material Facts will be "(Deft's Stmt. ¶ # );" and the Affidavit of Defendant Village Gun Shop, Inc. d/b/a Village Vault in Opposition to Plaintiffs' Motion for Partial Summary Judgment Against Defendant, Village Gun Shop, Inc. d/b/a Village Vault By Peter G. Dowd will be "(Dowd Aff't. ¶ # )."

other weapons that James Jarvis possessed in his residence.  (Deft's Stmt. ¶ 6.)

At 9:45 a.m. on July 9, 2010, James Jarvis appeared at a hearing in North Adams District Court, at which his wife appeared as well, and a judge reviewed the restraining order that had been issued earlier that morning.  The Court extended the order to August 9, 2010 and scheduled a hearing for that date.  (Deft's Stmt. ¶ 8.)  On August 9, 2010, a District Court judge held another hearing, at which both Jarvis and his wife appeared, both represented by counsel.  After this hearing, the Court extended the restraining order against Jarvis for one year until August 2, 2011.  (Deft's Stmt. ¶ 9.)  On August 2, 2011, the Court vacated the restraining order.  (Deft's Stmt. ¶ 10.)

On July 9, 2010, after he left the marital residence, James Jarvis moved into his parents' house at 6 Davis Street in Adams, Massachusetts and lived there for two years.  (Deft's Stmt ¶ 12.)  During that time, as long as the restraining order against James Jarvis was in effect, the State Police were not able to return the guns to Russell Jarvis, with whom James was living. (Deft's Stmt. ¶ 12.)  Russell claims that he spoke to the State Police about the guns being returned to him but he also admits that, at the time he spoke to the State Police he was not then licensed to carry firearms, and the police were not able to give him the guns lawfully.  (Deft's Stmt. ¶ 12.)

Russell Jarvis did not tell the police that he wanted to transfer his guns to a particular person.  Nor did James or Russell notify the police in writing to transfer the guns to anyone.  (Deft's Stmt. ¶ 13.)  On July 21, 2010, the Adams Police Chief sent James Jarvis a letter suspending his FID card, under G. L. c. 140, § 129B.  This letter informed Jarvis that his firearms must be surrendered, along with his FID Card, to the licensing authority where he resided, "in accordance with M.G. L. c. 140, § 129D."  (Deft's Stmt. ¶ 14.)  Jarvis did not look at

the statute or ask his lawyer to.  (Deft's Stmt. ¶ 14.)

On August 11, 2010, at the request of the State Police, Village Vault, a licensed firearms dealer with a bonded storage facility, took Jarvis's guns and ammunition for further storage. Village Vault inventoried all the items and sent the written inventory, with a letter disclosing its fees, to Jarvis on that same day.  (Dowd Aff't ¶¶ 11, 12, 13.)  When Jarvis failed to pay the invoiced storage fees, Village Vault notified him in writing that it would auction the guns to pay the outstanding fees.  On May 21, 2011 and September 24, 2011, Jarvis's guns were auctioned by Village Vault.  (Dowd Aff't ¶¶ 14, 15, 16.)

Plaintiff Robert Crampton was issued an FID card in the late 1960's.  (Deft's Stmt. ¶ 17.) This FID card expired on or about April 16, 2000.[3]  On June 1, 2010 a report was made to the Tewksbury Police regarding a suspected break-in at Crampton's home.  During the investigation the police learned that Crampton possessed firearms at his home even though his FID card was expired.  After Crampton gave his firearms and ammunition to the Tewksbury Police, on June 2, 2010, the police told him that he needed to obtain a current license or FID card.  (Pltfs' Stmt. ¶¶ 40, 41, 45, 46; Deft's Stmt. ¶18.)  Crampton never requested the Tewksbury Police to transfer his guns and ammunition to anyone.  (Deft's Stmt. ¶ 19.)  Crampton did not, after June 2, 2010, apply for a new FID card or a license to carry firearms, nor was any ever issued.  (Deft's Stmt. ¶ 20.)  On November 15, 2010, Tewksbury Police transferred Crampton's firearms and ammunition to Village Vault for continued storage.  That same day, Village Vault inventoried Crampton's firearms and mailed him the written inventory and a letter disclosing its storage

---

[3] In July 1998, G. L. c. 140, § 129B was amended by St. 1998, Chapter 180, § 29, to make FID cards valid for four years and to cause Crampton's FID Card to expire on April 16, 2000.  St. 1998, Ch. 180, § 73 (providing for expiration of prior FID cards on licensee's birth date in 2000). See also St. 1998, Ch. 358, § 11, amending St. 1998, Ch. 180, § 73.  Subsequently, by St. 2004, Ch. 150, § 5, FID cards were made valid for six years from the date of issuance.

terms.  (Dowd Aff't ¶¶ 17, 18.)  Crampton failed to pay the invoiced fees and, after notifying

him in writing, Village Vault, on September 24, 2011 and November 19, 2011, auctioned his

guns.  (Dowd Aff't ¶¶ 19, 20, 21.)

ARGUMENT

I.      <u>Plaintiffs Received All The Process Due When Their Guns Were Taken Into Police
        Custody; Thereafter The Statute Governing Storage Informed The Owners of How
        The Guns Would Be Disposed And Their Right To Sell or Transfer The Guns.</u>

The plaintiffs claim they were denied due process when their firearms and ammunition

were transferred to Village Vault allegedly without prior notice of such transfer, and because

they then became liable to pay Village Vault's reasonable storage fees.  Plaintiffs claim that they

were entitled to a hearing before Village Vault auctioned the firearms to pay the outstanding fees

the plaintiffs owed.  To the contrary, the plaintiffs received all the process to which they were

due, when their firearms and ammunition were surrendered to the police due to a lawful court

order under G. L. c. 209A, and subsequent order suspending the FID card (in Jarvis's case), and

the expiration of, and failure to renew, an FID card (in Crampton's case).  Indeed, the plaintiffs

were provided either the opportunity for a judicial hearing, or an actual hearing, regarding the

propriety of the seizure of the guns, and they do not contest the weapons seizures or claim that

their rights were violated when that occurred.

Moreover, all gun owners are on notice that G. L. c. 140, § 129D permits the licensing

authority to transfer guns to a storage facility, the storage facility to charge the owner

"reasonable storage charges," and the guns to be auctioned if the charges are not paid.  The

statute itself gives the owner all the notice necessary.  <u>See</u> <u>City of West Covina v. Perkins</u>, 525

U.S. 234, 241 (1999) (an owner who has been informed that his property has been seized "can

turn to [published, generally available state statutes and case law] to learn about the remedial

8

procedures available to him" and due process requires nothing more).  The plaintiffs are licensed to possess firearms under G. L. c. 140 and, as such, are presumed to know and be familiar with the laws governing their responsibilities as licensed persons.  Several statutes governing firearms licensing and possession refer to the provisions of section 129D, see G. L. c. 140, §§ 121; 128A; 129B (4), (12); 129C; 131(a), (f), (m); and plaintiff Jarvis, at least, was specifically notified by the Adams Police that section 129D applied to him.

G. L. c. 140, § 129D authorizes the licensing authority to dispose of an owner's guns, if unclaimed after one year, but also gives the owner the right, within that year, to have the guns sold or transferred to another person, legally authorized to possess firearms.  But if the owner does nothing, failing to sell or transfer his firearms, or failing to obtain reinstatement of his right to possess firearms, he is responsible for all storage fees and, if he ignores this obligation, is at risk of the loss of his firearms.  G. L. c. 140, § 129D.  Notice and hearing is provided at the initial seizure and loss of license, and by the terms of the statute.  The risk of permanent loss occurs only if the owner fails to assert his right to sell or transfer the firearms or fails to get his license or FID card reinstated.  The statute does not require the licensing authority or the police department to store or maintain custody of an owner's firearms, free of charge.  Rather, the licensing authority is permitted to transfer the firearms to a licensed dealer for storage, if the owner does not otherwise transfer them, until the year is up.  The licensed dealer's storage of the firearms is solely for the benefit of the owner and, by failing to otherwise sell or transfer his guns, the owner is deemed to have consented to their storage by the licensed dealer, for which the owner is liable to pay a "reasonable" fee.

"The constitutional guarantee of procedural due process applies to governmental deprivation of a legitimate 'property' or 'liberty' interest within the meaning of the Fifth or

Fourteenth Amendment.  It requires that any such deprivation be accompanied by minimum

procedural safeguards, including some form of notice and a hearing." Mitchell v. W. T. Grant

Co., 416 U.S. 600, 624 (1974) (Powell, J., concurring).  "[D]ue process is flexible and calls for

such procedural protections as the particular situation demands.  'Consideration of what

procedures due process may require under any given set of circumstances must begin with a

determination of the precise nature of the government function involved as well as of the private

interest that has been affected by governmental action.' " Morrissey v. Brewer, 408 U.S. 471,

481 (1972) quoting from Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 895

(1961).  A post-deprivation hearing may satisfy due process in certain circumstances, depending

on a balancing of competing interests.  See Mathews v. Eldridge, 424 U.S. 319, 335 (1976) (due

process does not require hearing prior to suspension of disability benefits where such benefits

were not granted based on financial need) and compare Goldberg v. Kelly, 397 U.S. 254, 267

(1970) (due process requires hearing before the suspension of welfare assistance benefits where

benefits are provided based on financial eligibility).  Given the circumstances presented here –

the risk presented by unlicensed or violently abusive persons continuing to possess firearms – an

immediate seizure of the weapons with a subsequent hearing within a very short time, is entirely

consistent with due process.  See Hightower v. City of Boston, 693 F.3d 61, 84-86 (1st Cir. 2012)

(due process does not require pre-deprivation hearing before suspending license to carry firearms

given concerns for public health and safety); Spinelli v. City of New York, 579 F. 3d 160, 170

(2d Cir. 2009) (due process does not require pre-seizure hearing where police seize firearms

dealer's license and firearms upon discovery of inadequate security in gun shop).  The plaintiffs

do not argue otherwise.

       Typically, either the licensing authority has suspended the license, or sought surrender of

the guns due to the expiration of the license or FID card, or the court has ordered surrender of the weapons as part of a domestic violence restraining order, or under the authority of G. L. c. 209A, § 3B. In the plaintiffs' cases, it is undisputed that these actions were accompanied by both notice and opportunity to be heard. Once the licensing authority has taken lawful custody of the guns, the provisions of G. L. c. 140, § 129D govern their retention, storage and disposition. What takes place thereafter, under G. L. c. 140, § 129D, is triggered by the initial (and continuing) lawful surrender of the weapons, and what ultimately happens depends on whether the owner exercises the rights recognized by the statute, to arrange for sale or transfer to any lawfully authorized person the owner desires to take possession of his firearms.

The conduct of the storage facility is not state action, nor is the facility a state agent. The decision to transfer an owner's guns to a storage facility is in the discretion of the licensing authority or police department, is for the benefit of the owner, and results from the owner's failure to make his own arrangements for storage of the firearms, as the statute provides.

The weapons in Jarvis's possession were taken after a judge issued a restraining order under G. L. c. 209A, § 3B.[4][5] Jarvis had the right to "petition the court which issued such suspension or surrender order for a review of such action and such petition shall be heard no later than ten court business days after receipt of the notice of the petition by the court." G. L. c.

---

[4] "[U]pon issuance of a temporary or emergency [restraining] order . . . , the court shall, if the plaintiff demonstrates a substantial likelihood of immediate danger of abuse, order the immediate suspension and surrender of any license to carry firearms and or [FID] card which the defendant may hold and order the defendant to surrender all firearms, rifles, shotguns, machine guns and ammunition which he then controls, owns or possesses . . . and any license to carry firearms or [FID] cards [of the defendant's] shall be surrendered to . . . law enforcement officials . . . [who] may store, transfer or otherwise dispose of any such weapon in accordance with the provision of section 129D of chapter 140 . . . " G. L. c. 209A, § 3B.

[5] Since the issuance of a temporary order without notice depends on a showing of "a substantial likelihood of immediate danger of abuse," under G. L. c. 209A, § 4, an order to surrender firearms must be included in the temporary order, by operation of G. L. c. 209A, § 3B.

209A, § 3B.  This hearing may be had at the same time as the hearing provided by G. L. c. 209A, § 4, 2nd par. (defendant has right to be heard within ten court business days on issue of continuing temporary abuse prevention order).  G. L. c. 209A, § 3B.  Here, Jarvis was present at a hearing on the same day the restraining order issued.  The court continued the restraining order in effect for 30 days and, on August 9, 2010, Jarvis appeared with counsel for another hearing.  The Court then continued the order for a year to August 2, 2011.

In the meantime, the Adams Police notified Jarvis, by letter dated July 21, 2010, that his FID card was suspended, due to the issuance of the restraining order.  See G. L. c. 140, § 129B.  The letter told Jarvis to surrender his firearms and notified him that the provisions of G. L. c. 140, § 129D applied to his circumstances.  Under G. L. c. 140, § 129B, Jarvis had the right to petition the District Court to contest this suspension and obtain an evidentiary hearing.  Godfrey v. Chief of Police, 616 N.E.2d 485, 487 (Mass. App. Ct. 1993).

Crampton's FID card had expired in 2000.[6]  When the Tewksbury Police discovered he had firearms he surrendered them as required by G. L. c. 140, § 129B(12).  Under G. L. c. 140, § 129B, however, Crampton had the right to contest the surrender by seeking a hearing in the District Court.  And, if he had applied for, and was granted, a renewal or reissuance of his FID card, he would have been entitled to return of his firearms.  See G. L. c. 140, § 129B(12) (referring to provisions of § 129D).  More than five months after he surrendered his firearms, on November 15, 2010, the Tewksbury Police transferred Crampton's firearms to Village Vault for continued storage.  But Crampton never sought a new FID card nor and never notified the police in writing to transfer his guns to any other person.

Similarly, Jarvis did not get his FID card or license to carry reinstated, due to the

---

[6]  See footnote 3, supra.

continuing validity of the restraining order, nor did he ever present the State Police written notification of a sale or transfer to another legally authorized person (under G. L. c. 140, § 129D).  Rather, the District Court, on August 9, 2010, extended the restraining order until August 2, 2011 and the State Police, on August 11, 2010, transferred Jarvis's weapons and ammunition to Village Vault for continued storage.

The Plaintiffs had more than adequate process when their firearms were seized and maintained under G. L. c. 140, § 129D.  Once the police had lawful custody, § 129D authorizes the retention of an owner's firearms for one year and, at the end of that time, the sale of the firearms.  It is entirely in the owner's power to avoid the sale after one year, by arranging for an earlier sale or transfer, or by having his right to possess the weapons reinstated.  But if the owner does not have that right reinstated within one year, or fails to arrange a sale or transfer, then forced sale can take place under the statute.  In the meantime, G. L. c. 140, § 129D does not require the police to store guns free of charge; rather it gives the police the discretion to transfer the firearms to a storage facility for continued storage, at the owner's expense.

II.   <u>After the Police Take Custody of Firearms, And the Owner Fails to Arrange For Sale or Transfer of the Guns, No Additional Due Process Protections Attach to The Procedures Provided by Section 129D.</u>

No more constitutional due process protections are required when the police department decides, under G. L. c. 140, § 129D, to transfer an owner's firearms to a licensed dealer for further storage, even though such transfer subjects the owner to liability for storage fees and to the dealer's auctioning off the guns, in the event the storage fees go unpaid for 90 days.  This is so for the following reasons.  First, there is no legitimate property interest in, that is, no "legitimate claim of entitlement" to, the indefinite, cost-free maintenance of seized firearms in the hands of the police; the statute properly allows the police discretion to decide when and

13

whether to transfer the firearms to a licensed dealer for storage purposes. Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972). Whether a property right exists depends on whether state law creates an entitlement, and whether state law invests state actors with discretion to withhold the entitlement. See Clukey v. Town of Camden, 717 F.3d 52, 56 (1st Cir.2013). To show a "legitimate claim of entitlement," a court will look to the "existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Bd. of Regents of State Colleges v. Roth, 408 U.S. at 577. Where "statutory and administrative standards defining eligibility for [welfare benefits]" exist, for example, there is a property interest in continued receipt of benefits, and compliance with those standards is protected by procedural due process. Id. at 576. On the other hand, where a state university teacher has a contractual appointment for only one year, but no rights to re-employment in the contract, and no statutory or administrative standards define eligibility for re-employment, there is no legitimate entitlement to re-employment, other than "an abstract concern in being rehired," sufficient to amount to a property interest protected by due process. Id. at 578. If government officials can grant or deny a benefit in their discretion, without standards to circumscribe that discretion, and without any limitation in the law establishing the claimed entitlement, then for purposes of due process no property interest exists. Clukey v. Town of Camden, 717 F.3d at 56.

Here, G. L. c. 140, § 129D gives the police or licensing authority broad discretion and authority to transfer weapons to a licensed dealer for storage purposes, specifying no criteria or standards for the exercise of such discretion, with one exception; "[t]he licensing authority, . . ., may transfer possession of such weapon for storage purposes to a federally and state licensed dealer . . . who operates a bonded warehouse on the licensed premises that is equipped with a

safe for secure storage . . .; provided, however, that the licensing authority shall not transfer . . . any weapon that is or may be evidence" in a criminal case.  G. L. c. 140, § 129D.  Since the plaintiffs' guns were not held as evidence, nothing limited the police department's authority to transfer the guns to a dealer for storage.  Thus, the plaintiffs had no legitimate entitlement to have the police maintain custody and store their guns, free of charge.  For, indeed, that is the upshot of plaintiffs' claim; that they have a right to have the police store their guns indefinitely and free of charge after plaintiffs' firearms were seized when they lost the legal right to possess them.  Plaintiffs contend, in effect, that if the police are going to transfer the guns to a fee-charging dealer for storage, they have a due process right to oppose the police department's exercise of that discretion.  There is simply no support in the case law for this claim.

Second, by accepting possession of the firearms, the storage facility did not become an agent of the government; to the contrary, the storage facility was acting in the service of the owner, storing his property until he became re-authorized to possess it or until he otherwise disposed of it.  The due process clause of the Fourteenth Amendment only applies to state action, or to deprivations caused by a "person who may fairly be said to be a state actor."  Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982).  A private party may be considered a state actor if it is exercising, or has been delegated, a power "traditionally exclusively reserved to the State."  Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 157-158 (1978) quoting Jackson v. Metropolitan Edison Co., 419 U.S. 345, 352 (1974).  Plaintiffs fail to make any showing that the storage of private property is a function the State traditionally performed alone.  Nor is it enough that a state statute authorized the private entity's acts or even that the state acquiesced in the conduct.  Flagg Bros., Inc., 436 U.S. at 164-165 (creditor's self-help remedies, authorized by statute, including warehouseman's sale of goods to satisfy overdue storage charges, was not state

action).  See also Penney v. First Nat. Bank of Boston, 433 N.E.2d 901, 904 (Mass.1982)

(creditor's repossession and sale of boat to pay overdue note, although done under authority of

state statute, did not constitute state action).  All the police department did here was to request a

specific dealer to take possession of the firearms for storage.  The police did not require or

coerce Village Vault to store the firearms, did not require the assessment of any particular

storage fees, did not require the sale of the guns to satisfy unpaid charges, and had no

involvement in any of Village Vault's activities.  The statute sets minimum standards for Village

Vault to satisfy, in order to properly store the owner's guns and assert its remedies in the event of

non-payment.  This looks nothing like those cases in which state action has been found in a

private entity's conduct.  See Brentwood Academy v. Tennessee Secondary School Athletic

Ass'n, 531 U.S. 288, 296-297 (2001) (providing survey of examples showing state action or not).

Ass'n, 531 U.S. 288, 296-297 (2001) (providing survey of examples showing state action or not).

        The cases upon which plaintiffs rely to show state action, involving the seizure, towing,

and storage of cars, and assessment of storage fees, by private towing companies, are inapposite.

This is because, in towing cases, a government official makes the initial decision to tow the car,

instructs the private company to tow the car, and the car is stored and kept as security for

payment of the parking violations and overdue fines owed to the governmental agency.  See, e.g.,

Goichman v. Rheuban Motors, Inc., 682 F.2d 1320, 1322 (9th Cir. 1982).  No such joint action,

takes place here.  Rather, the police department has no obligation - traditional, statutory, or

otherwise – to store private property.  The owner has the right to sell or transfer his guns and, if

he fails to do so, storage of the owner's guns is meant to protect the owner's interests, at least

during the one year the statute provides the owner to deal with the property.  Beyond its interest

in keeping guns out of the hands of unlicensed individuals, storage of the guns was not in the

government's interest but was for the owner's benefit.  Only rarely is a private party's conduct

16

attributed to the State.  Since Village Vault was not authorized to exercise state power, did not

engage in a joint effort or participate in otherwise governmental action, and did not engage in a

public function usually reserved to the state, Village Vault was not a state actor for purposes of

due process.[7]  See Grapentine v. Pawtucket Credit Union, 755 F.3d 29 (1st Cir. 2014); Mead v.

Independence Ass'n, 684 F.3d 226, 231-233 (1st Cir. 2012); Estades-Negroni v. CPC Hosp. San

Juan Capestrano, 412 F.3d 1, 4-8 (1st Cir. 2005).

Third, the owners had notice of the possibility the police would transfer their firearms to

a licensed dealer for storage, by virtue of the language of the statute itself and the heightened

presumption of notice given their status as owners of the property and persons licensed to carry

firearms under a comprehensive licensing and regulatory scheme.  The statute provides all the

notice plaintiffs' required.  As licensed gun owners they are expected to know the laws and

regulations governing gun possession, use, and ownership.  See U.S. v. DeBartolo, 482 F.2d 312,

316 (1st Cir. 1973) (internal quotations and citations omitted) (where firearms are involved, "the

probability of regulation is so great that anyone who is aware that he is in possession of them or

dealing with them must be presumed to be aware of the regulation.")  See also ICG Petroleum,

Inc. v. U.S. Dep't of Energy, 883 F.2d 80, 82 (Temp. Emg'y Ct. of Appeals) (companies

working in heavily regulated industry are reasonably expected to know regulatory obligations

and existence of regulations constitute sufficient notice to satisfy due process).  G. L. c. 140, §

129D itself gave the plaintiffs sufficient notice as to the possible disposition of their property,

---

[7] This does not mean that a person aggrieved by Village Vault's alleged violation of the law has
no remedy.  Such a person may bring an action for conversion, claiming wrongful detention of
property.  See Grand Pac. Fin. Corp. v. Brauer, 783 N.E.2d 849, 857 (Mass. App. Ct.), rev.
denied, 791 N.E.2d 346 (Mass. 2003) (stating elements of conversion).  See also Revell v. Port
Authority of New York and New Jersey, 598 F.3d 128, 138-139 (3d Cir. 2010) (civil conversion
action adequate post-deprivation remedy for wrongful retention of property); Goichman v.
Rheuban Motors, Inc., 682 F.2d 1320, 1325-1326 (9th Cir. 1982) (due process satisfied where
civil remedy for conversion is available to challenge reasonableness of towing and storage fees).

should they fail to take affirmative actions.  Indeed, "persons owning property within a State are charged with knowledge of relevant statutory provisions affecting the control or disposition of such property."  Opinion of the Justices, 536 N.E.2d 203, 207 (Mass. 1990), quoting from Texaco, Inc. v. Short, 454 U.S. 516, 532, 537 (1982) (due process satisfied by enactment of "rule of law uniformly affecting all citizens that establishes the circumstances in which a property interest will lapse through the inaction of its owner.")

Nor does due process require individual notice to a property owner, whose property has been seized by police, of the state-law remedies available to seek return.  City of West Covina v. Perkins, 525 U.S. 234, 241 (1999) (an owner who has been informed that his property has been seized "can turn to [published, generally available state statutes and case law] to learn about the remedial procedures available to him" and due process requires nothing more).  Upon the seizure of their firearms, the plaintiffs could have read the statute and learned that if they failed to sell or transfer their own guns, as the statute allowed, the police might, in their sole discretion, transfer the guns to a licensed dealer for storage, at the owner's expense, and that, if a year went by without any change in their rights to take possession of the guns, the guns could be sold regardless of whether they paid storage fees.  Here, over a month passed after the seizure of Jarvis's weapons and, when the restraining order was extended for a year and Jarvis had not otherwise arranged for sale or transfer of his guns, the State Police turned the guns over to Village Vault.  Crampton's guns were turned over to Village Vault after sitting in the Tewksbury Police Department for over five months, with Crampton failing to take any measures to get his FID card reinstated or to transfer his weapons to anyone else.  Both were on adequate notice that their inaction might result in the guns being transferred for continued storage.

Fourth, the notice plaintiffs seek – notice prior to police transfer of the guns to the

18

licensed dealer – is not the type of notice needed for, and does not serve the purposes of, due process, that is, to apprise the owner of a pending action, and the legal and factual basis for the action, to allow the owner to contest that basis at a hearing before an impartial decision-maker. Rather, plaintiffs seek notice in the nature of a warning simply to allow them to seek alternatives to, and avoid the consequences, of the transfer.  This might be useful but it is not constitutionally required.  The specific notice plaintiffs seek and the hearing they claim was due prior to the auction of their guns for nonpayment of the fees, are not designed to satisfy the purposes of due process protections.  Due process protections are intended to allow a person, whose life, liberty or property is sought to be taken by the government, to know the legal and factual basis for the government action and to test the correctness of this basis before an impartial decision-maker. See Goldberg v. Kelly, 397 U.S. 254, 267 (1970); Mathews v. Eldridge, 424 U.S. 319, 335 (1976).  But, the notice before transfer plaintiffs want is not designed to allow the owner to contest the basis for the intended transfer.  Rather, it is sought simply as a warning to the owner that would spur him to exercise his other options to avoid the transfer, options he had previously failed to exercise.  Moreover, since the police decision to transfer the weapons for storage is in their sole discretion, there is no basis to challenge the intended transfer.

Similarly, the hearing that plaintiffs seek is not intended to satisfy their due process concerns that an impartial decision-maker decide disputed issues of fact and law, upon which the proposed action turns, to help ensure the existence, and reliability, of a sound basis for the action. Whether the licensed dealer is entitled to auction the guns, after 90 days of arrears in the payment of storage charges, depends solely on the simple question of whether the storage fees were paid or not.  Here, there is no dispute that the plaintiffs did not pay the fees.  Under all the circumstances, this fact should be easily determinable, and no special procedural protections are

required in the context of this typical commercial transaction.

CONCLUSION

For all the foregoing reasons, plaintiffs' motion for partial summary judgment should be

denied and judgment should enter against plaintiffs on their claim of violation of due process.


Respectfully Submitted,

MARTHA COAKLEY
ATTORNEY GENERAL

For:   SECRETARY ANDREA CABRAL,
       in her Official Capacity as Secretary of the
       Executive Office of Public Safety
       And Security

_/s/ David R. Marks_____
Assistant Attorney General
Office of the Attorney General
BBO No. 548982
One Ashburton Place, Room 2019
Boston, MA 02108-1698
(617) 963-2362
Facsimile:  (617) 727-5785
david.marks@state.us.ma

Dated:  August 21, 2014


**CERTIFICATE OF SERVICE**

I hereby certify that the above motion was filed through the Electronic Case Filing (ECF)
system on date, and thus copies will be sent electronically to the registered participants as
identified on the Court's Notice of Electronic Filing (NEF).

/s/ David R. Marks

David R. Marks

Dated:  August 21, 2014