# ATTACHMENT A

1

Volume I
Pages 1 to 129
Exhibits 1 to 8

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - -x
                             :
RUSSELL JARVIS; JAMES JARVIS;  :
ROBERT CRAMPTON; and          :
COMMONWEALTH SECOND         :
AMENDMENT, INC.,           :  Civil Action
         Plaintiff,       :  No.
                            :  1:12-cv-40032
   -against-             :
                            :
VILLAGE GUN SHOP, INC. d/b/a,  :
VILLAGE VAULT; and SECRETARY  :
MARY E. HEFFERNAN, in her    :
Official Capacity as        :
Secretary of the Executive    :
Office of Public Safety and   :
Security,                  :
         Defendants.      :
                            :
- - - - - - - - - - - - - - - -x

     DEPOSITION OF JAMES JARVIS, a witness called
on behalf of Defendant Secretary Mary E. Heffernan,
taken pursuant to the Federal Rules of Civil Procedure,
before Nancy M. Kingsbury, Registered Professional
Reporter and Notary Public in and for the Commonwealth
of Massachusetts, at the Office of the Attorney
General, 10 Mechanic Street, Worcester, Massachusetts,
on Friday, March 7, 2014, commencing at 2:08 p.m.

PRESENT:

    David Jensen PLLC
        (by David D. Jensen, Esq.)
        111 John Street, Suite 420
        New York, NY 10038, for the Plaintiff.
        david@djensenpllc.com
        212.380.6615

(Continued on the next page)

2

PRESENT (Continued):

    Glickman, Sugarman, Kneeland & Gribouski
        (by Wayne M. LeBlanc, Esq.)
        P. O. Box 2917
        Worcester, MA 01609,
        for Defendant Village Gun Shop, Inc.,
        d/b/a Village Vault.
        leblanc@gskandg.com
        508.756.6206

    Office of the Attorney General
        (by David R. Marks, Asst. Attorney General)
        One Ashburton Place, 20th Floor
        Boston, MA 02108,
        for Defendant Secretary Mary E. Heffernan.
        david.marks@state.ma.us
        617.727.2200, ext. 2362

ALSO PRESENT:  Alex Mooradian, student intern

                    *  *  *  *  *

3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|

JAMES JARVIS

  BY MR. MARKS            6

  BY MR. LeBLANC                    80

*  *  *  *

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | Document on letterhead of Massachusetts Instant Record Check System | 23 |
| 2 | Document on letterhead of Department of Criminal Justice Information Services Firearms Records Bureau | 25 |
| 3 | Document on letterhead of Massachusetts Department of Criminal Justice Information Services | 31 |
| 4 | Document on letterhead of Adams Police Department dated 8/31/2004 | 33 |
| 5 | Document on letterhead of Adams Police Department dated 9/22/2004 | 33 |
| 6 | Document on letterhead of Massachusetts Instant Record Check System titled "License History and Details for Jarvis, Russel N" | 68 |

4

1                          E X H I B I T S, Continued

2        NO.                      DESCRIPTION                    PAGE

3        7        Letter dated 7/21/2010 to James A.              79
                  Jarvis from Chief Donald Poirot

4
5        8        Document titled "Declaration of                95
                  James Jarvis" with attachments

6

7                              *   *   *   *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

5

1                P R O C E E D I N G S

2            MR. MARKS:  The deposition of the

3    Plaintiff, James Jarvis, in Jarvis, et al., vs.

4    Village Vault or Village Gun Shop.

5            Other than the usual stipulations, whatever

6    they may be, I would not want to waive his reviewing

7    the transcript and making any corrections, if there

8    are any.  Anything else?

9            MR. JENSEN:  What are the usual

10   stipulations?  I'm a district attorney.

11           MR. MARKS:  I think -- well, maybe we

12   should talk about it.  I think one of them is if you

13   don't object on the basis of form, that you waive

14   that.  Maybe you don't want to.

15           MR. JENSEN:  No, that's standard rules.

16           MR. LeBLANC:  Usually that any objections

17   except to form.  So anything else is open to

18   objection later.

19           MR. JENSEN:  All right, good.

20                        JAMES JARVIS

21   a witness called for examination by counsel for

22   Defendant Secretary Mary E. Heffernan, having been

23   satisfactorily identified by the production of his

24   driver's license and being first duly sworn by the

6

1    Notary Public, was examined and testified as

2    follows:

3                    DIRECT EXAMINATION

4        BY MR. MARKS:

5        Q.    Let's start with your name.

6        A.    James Jarvis.

7        Q.    And what's your date of birth?

8        A.    ████ 1965.

9        Q.    And where were you born?

10       A.    North Adams, Mass.

11       Q.    Have you been known by any other names?

12       A.    No.

13       Q.    Where do you currently live?

14       A.    108 Furnace Hill, Cheshire, Mass.

15       Q.    How long have you been there?

16       A.    Almost exactly a year.

17       Q.    Do you live there with anybody else?

18       A.    Yes.

19       Q.    Who do you live there with?

20       A.    My fiance.

21       Q.    What is her name?

22       A.    Donna Mayer, M-a-y-e-r.

23       Q.    What was your last address before that?

24       A.    6 Davis Street, Adams, Mass.

1      Q.    So what did you learn about shooting?

2      A.    Basically at that age it was mostly just

3    target practice.

4      Q.    I mean, I assume you learned how to use the

5    gun?

6      A.    Yes, safety, never point it at anybody,

7    basic safety rules.

8      Q.    So it's safe to say there are rules --

9      A.    Yes.

10     Q.    -- concerning the use of guns?

11     A.    (Witness nods head)

12     Q.    And you first learned those from your

13   father?

14     A.    Yes.

15     Q.    Do you recall when you got your first

16   firearms identification card or license to carry?

17     A.    Yes.  I completed a sportsmen -- the

18   Massachusetts sportsmen's class, and they give you

19   your FID as soon as you turn 15.

20     Q.    So that's when you were age 15?

21     A.    Yes.

22     Q.    Now, that was not a license to carry?

23     A.    That was an FID.

24     Q.    Do you recall anything about the class?

11

1      A.    Yeah.   I mean, they taught you basics about

2  animals.   They taught you all of the basic safety

3  rules.   You had a card that was given to you that I

4  believe had ten safety rules that you were supposed

5  to learn and follow.   You had to take a test at the

6  end of the course.

7      Q.    What was on the test?

8      A.    Basically the book learning that you had to

9  go through.   The ten safety rules were, I believe,

10 the biggest part of the test.

11     Q.    So you had a book you had to study?

12     A.    Yes.

13     Q.    What was in the book generally?

14     A.    Yeah, again, the safety rules mostly.  ·Some

15 things on animals as far as tracking different types

16 of footprints.   Some other of the laws that were

17 basic laws about hunting.

18     Q.    What about laws regarding firearms?

19     A.    I think that kind of went under the ten,

20 you know, those ten safety things, ten specifics.

21 Never point at someone, always be sure of where your

22 bullet is going, when you were supposed to carry a

23 loaded gun, when you weren't.

24     Q.    So some of these things sounded, like you

1    said, like safety rules, but you know the laws

2    regarding firearms go beyond just safety, right?

3         A.    Yes.

4         Q.    They talk about who is allowed to have them

5    and under what circumstances and when not they

6    should be loaded, right?

7         A.    Yes.

8         Q.    So did this course cover those things?

9         A.    Yes, I assume, but it was 30, 35 years ago.

10   It's hard to remember what was actually in the book.

11        Q.    Right.  But you understood that the FID

12   card was one thing you needed under the law, right?

13        A.    (Witness nods head)

14        Q.    And, two, it allowed you to do certain

15   things and didn't allow you to do other things; is

16   it fair to say?

17              MR. JENSEN:  Objection.

18        A.    Yes.

19        Q.    Do you recall what licensing authority gave

20   you the FID?  The local police department?

21        A.    Yes.

22        Q.    Which one?

23        A.    Adams Police Department.

24        Q.    So do you recall or do you know now

1  generally what the FID allowed you to do with guns

2  or what you needed it for?

3      A.   Yes.  It allowed me to purchase guns,

4  purchase ammunition, target shoot and allowed me to

5  get a hunting license so I could hunt animals.

6      Q.   Do you know what kind of guns?  Was it all

7  guns?

8      A.   You could not carry a handgun with just a

9  regular ID card.

10     Q.   Was it important for you to know that?

11     A.   Yes.  That was told to us.

12     Q.   Do you know what would happen if you didn't

13  comply with that rule, shall we say?

14     A.   At that time, I didn't know, no, I don't

15  think.

16     Q.   So other than the Glenfield .22, what other

17  kinds of guns did you own as you grew up, shall we

18  say?

19     A.   My father gave me a 12-gauge Ithaca.

20     Q.   Any idea when?

21     A.   That was when I turned 15 so I could start

22  hunting.

23     Q.   Any other?

24     A.   I acquired different guns throughout the

1    gun?

2        A.    Yes.

3        Q.    How did you know that?

4        A.    I've known that since the laws have changed

5    a little bit.

6        Q.    But that's a law?

7        A.    Yes.

8        Q.    Do you know where the firearms laws are?  I

9    mean like what chapter they are.

10       A.    No.

11       Q.    So when you started buying your own guns

12   again, do you recall how often you shot?

13       A.    Depended on the time of year.

14       Q.    So it had to do with the hunting season

15   basically?

16       A.    It had to do with hunting seasons, or

17   turkey shoots are a big one in the fall.

18       Q.    Did you take any other courses in learning

19   how to shoot or learning about guns other than this

20   one in -- when you were what, 15, the sportsmen

21   class?

22       A.    No, I didn't take any other classes.

23       Q.    Do you recall when you got your first

24   handgun?

1      A.    I bought my own first handgun when I was on

2    Grove Street.   Not exactly sure what year.

3      Q.    Do you recall whether you -- at that time

4    whether you had an FID card or if you had a license

5    to carry?

6      A.    I had a license to carry.

7      Q.    Did you teach or shoot with your kids?

8      A.    Yes.

9      Q.    And you taught them how to use guns?

10     A.    Yes.

11     Q.    And taught them the rules?

12     A.    Yup.

13     Q.    Had you used handguns before you bought

14   your own?

15     A.    Yes.

16     Q.    Do you recall when?

17     A.    Going back to when I was a kid with my

18   father.

19     Q.    So you used your father's?

20     A.    Yes.

21     Q.    And you know also, I assume, how to store

22   guns and where to store guns?

23     A.    Yes.

24     Q.    What do you know about those rules or what

1   do you do?

2        A.    Anything that is --

3        Q.    Two different questions.

4        A.    Anything that is not in a locked case has

5   to have a key lock either on the trigger or through

6   the chamber.  While transporting the gun, it has to

7   be locked with a trigger or in a locked case.

8        Q.    Whose rules are these?

9        A.    State.

10       Q.    Well, so is it fair to say that if you own

11  guns, you have to know the laws regarding guns in

12  general?  Possession, storage, transportation, et

13  cetera?

14       A.    The common rules, yes.

15       Q.    Now, at some point when you lived in

16  Cheshire, you had a gun cabinet; is that right?

17       A.    Yes.

18       Q.    Can you tell us a little bit about this gun

19  cabinet?

20       A.    Yeah.  I custom built it right into the

21  wall of the house in the basement.

22       Q.    So it wouldn't have been transportable?

23       A.    No.  It was built right into the house.

24       Q.    Any idea when you did that?

1      A.    The first year I moved into Dublin Road.

2      Q.    Any idea how many guns you had at that

3  point?

4            MR. JENSEN:   Just to clarify, the first

5  year he moved into the house at Dublin Road, at that

6  point?

7            MR. MARKS:   Yes.

8      A.    The reason for building the big storage

9  facility was that I was going to be storing my

10 father's guns as well as my own, and my son's guns

11 were in there.  So it was a big facility

12 specifically made to handle all the guns that all of

13 us owned.

14     Q.    You anticipated me.  That was my next

15 question.  So any idea how many you had once you

16 built that?

17     A.    There were 31 or 32 guns in it.

18     Q.    And that was the first year you lived

19 there?

20     A.    Yes.

21     Q.    Did you own the house?

22     A.    Yes.

23     Q.    And from the time you built it, you stored

24 both your and your father's and your son's guns

19

1   there?

2       A.   That's correct.

3       Q.   And did you store them there until you

4   moved out basically?

5       A.   Yes.

6       Q.   So it would be nice to pick a date.   Do you

7   recall the date roughly when you moved in there?

8       A.   I would say 2002.

9       Q.   Again, your family's guns were there from

10  the time you built it?

11      A.   Yes.

12      Q.   Did you -- were they distinguished from

13  each other in any way?   In other words, did you have

14  labels on them --

15      A.   No.

16      Q.   -- as to whose guns they were?

17      A.   No.

18      Q.   Was there any documentation of ownership in

19  the cabinet?

20      A.   My father had documentation.

21      Q.   But not in the cabinet?

22      A.   No.   He had his own documentation.

23      Q.   I assume you had access to all of the guns,

24  right?

20

1      A.    Yes.

2      Q.    Was there anything that prevented you from

3    using any of the guns?  You know, for example, were

4    any of them separately locked in a way that you

5    couldn't access it?

6      A.    No.  I had access to all the guns.

7      Q.    And they didn't have a separate trigger

8    lock that was, you know, special to a particular

9    person, like a fingerprint or whatever?

10     A.    No.

11     Q.    And at that time, did those guns include

12   handguns?

13     A.    Yes.

14     Q.    So I assume -- maybe you can tell me.  Do

15   you feel like you know the rules regarding guns

16   generally and that you try to follow them?

17     A.    Yes, I know all the general rules, and yes,

18   I do believe I follow them quite well.

19     Q.    And I assume you are careful when you use

20   guns?

21     A.    Yes.

22     Q.    And store them.  Can you tell us why when

23   you did get -- I guess I know the answer.  When you

24   first got your FID card, you got an FID because you

1    weren't entitled to a license to carry, right, at

2    that time?

3          MR. JENSEN:   Objection.

4     A.    No.

5     Q.    Why did you get an FID at that point?

6     A.    No one is allowed to get an LTC until the

7    age of 18.  We all knew that if we wanted to hunt,

8    you applied for an FID card.  Most of us were in

9    there at 15 as fast as we could, or 14 so we could

10   hunt at 15.

11    Q.    Okay.  Again, you know the difference not

12   only between who is entitled to have them but the

13   different things that each allows you to do under

14   the law?

15    A.    Yes.  I know what the differences are, yes.

16    Q.    You may have already said this, but what

17   about regarding transportation of guns?  Obviously

18   if you were going hunting, I assume you are taking

19   the guns with you somewhere, right?

20    A.    Yes.  They have to remain unloaded in the

21   car.  You can't load them until you are a certain

22   distance off the road unless it's a dirt road.  You

23   have to be within so much of a distance away from

24   any house -- dwelling as they consider it.

1    Q.    And is that also the case regarding

2 discharge of guns?

3    A.    Yes.

4    Q.    So you know that there are rules about

5 discharge of guns?

6    A.    Yes.

7    Q.    What about ammunition; they have to be

8 carried separately, obviously?

9    A.    You can't have them in the gun, but you can

10 just carry them in your pocket, your truck.   It

11 doesn't matter.

12    Q.    Now, do you recall when you first applied

13 for a license to carry?

14    A.    I don't.

15    Q.    Do you recall where you were living at the

16 time?

17    A.    I applied for one when I lived in Adams.   I

18 think it was right before I moved to Cheshire, but I

19 don't remember if I got it out of Adams before I

20 moved to Cheshire or if I just got it out of

21 Cheshire when I continued the move.

22    Q.    Now, since I am a good lawyer, I know the

23 answers to these questions or at least some of them.

24 So I have -- first of all, we did get the records

23

1   from the Firearms Records Bureau, and those seem to

2   show that it looks like your license to carry came

3   out of Cheshire. So you can look at this. This is

4   the Firearms Records Bureau's records. We might

5   have it marked as an exhibit.

6                    (Document marked as JAJ

7                    Exhibit 1 for identification)

8        Q.   So it looks like your first license to

9   carry was issued in November of 2007 out of

10  Cheshire, right?

11       A.   Yup.

12       Q.   Does that sort of comport with your memory?

13       A.   I guess, yeah.

14       Q.   But you think you might have originally

15  applied for it --

16       A.   I did.

17       Q.   -- while you lived in Adams?

18       A.   I did apply for it in Adams.

19       Q.   Well, do you recall what happened? Did

20  Adams deny it?

21       A.   No, I was not denied. I'm not sure that I

22  went back. I know I applied. It was accepted. I

23  did my fingerprints. I did everything else that I

24  had to do. I don't know -- I was getting ready to

25

1   didn't take a new firearms safety course or anything

2   like that before you applied for that license to

3   carry?

4        A.    No.

5        Q.    So here is what I think is at least part of

6   your application at Cheshire.  It doesn't appear to

7   be the complete one because among other things it

8   doesn't have your signature.  But I wonder if you

9   could look at it and just tell us whether it looks

10  like your information, if you will.

11              (Witness reviews document)

12       A.    Yes.

13                   (Document marked as JAJ

14                   Exhibit 2 for identification)

15       Q.    I just want to draw your attention to the

16  second page where there's a question about --

17  Question No. 7.  So given that question, is it fair

18  to say that you -- at least at this point, you were

19  aware that -- well, first of all, you were aware of

20  the laws regulating use, possession, ownership,

21  sale, transfer, rental, receipt or transportation of

22  weapons or ammunition; is that fair to say?

23       A.    I don't believe I was aware of all the

24  laws.  I was aware of all general laws and I knew

26

1    that if you had done something majorly wrong, that

2    your right could be taken away.

3        Q.    So you knew that it was important that you

4    know the laws because, one, you could risk -- if you

5    didn't comply with the laws, you could risk losing

6    the license, right?

7        A.    Yes.

8        Q.    You also knew that if you didn't comply

9    with the laws, you were at risk of being charged

10   with a crime --

11       A.    Yes.

12       Q.    -- right?  So from this, I assume you made

13   it your business to know the laws regarding

14   firearms.

15       A.    Again, generally most of the general laws,

16   yes.

17       Q.    So referring back to Exhibit 1, which is

18   the printout of the license history from the

19   Firearms Records Bureau, it looks like you had an

20   FID card that expired at some point.  Is that true?

21       A.    No.

22       Q.    Do you recall this?

23       A.    No.

24       Q.    The one out of Milton, that's the one at

45

1    A.    No, but I wouldn't if I had already applied

2  for an LTC in between.

3    Q.    Okay.  So again, you may have already told

4  us this.  Why did you apply for an LTC in November

5  of 2007 or earlier, probably fall of 2007?

6    A.    Applying for it in the fall of 2007 I was

7  probably prompted to actually get the LTC.  My

8  father moves to Florida in the winters.  In order to

9  take his handguns while he was gone, I probably had

10  to make sure that I had the LTC in the house.

11    Q.    Is the timing working out, though?  When

12  did you build your gun cabinet in Cheshire?

13    A.    I built the gun cabinet I'm sure before I

14  got his handguns.  I built the gun cabinet when I

15  moved into Cheshire.

16    Q.    Which was, again, roughly?

17    A.    My daughter is going to be 11.  She was

18  one.  It could have been about ten years ago.  2004,

19  somewhere in that area.

20    Q.    So it looks like you probably had the

21  handguns before you got the license to carry, right?

22    A.    No.

23    Q.    No?  This didn't issue until 2007?

24    A.    But that doesn't mean that I had handguns

46

1    in that cabinet.  That means I built the cabinet

2    before the handguns were brought in.

3         Q.    And that you remember you did?

4         A.    Yes.

5         Q.    When did your father start going to Florida

6    for the winter?

7         A.    I don't remember.  Originally he kept his

8    own guns at his house because they only went for a

9    month or two at that time.  As the years progressed,

10   he continued to stay there longer.

11        Q.    Let's talk about July 9, 2010.  Did

12   something happen that resulted in your loss of the

13   possession of the guns and ammunition in your house?

14        A.    Yes.

15        Q.    What happened?

16        A.    I smashed a television and a video game.

17        Q.    And then?

18        A.    Then I moved out.

19        Q.    So how did the guns, you know, end up

20   leaving your house?

21        A.    I left the guns in the locked cabinet in

22   which no one other than myself and my oldest son had

23   the keys, and I moved all of my belongings and left

24   intentionally to move out permanently.

47

1      Q.    But to fill in the rest of the story, as a

2    result of what you did, the court issued a

3    restraining order?

4      A.    Yes.

5      Q.    That required you both to move out and to

6    turn over your guns and your FID card, right?

7      A.    Yes.

8      Q.    Or your license to carry, both of them?

9      A.    Yes.

10      Q.    The restraining order that issued on

11    July 9, that was a temporary ex parte restraining

12    order?

13      A.    That's correct.

14      Q.    That was valid for ten days?

15      A.    30 days.

16      Q.    Do you recall -- why do you say 30 days?

17      A.    Because I have the court paperwork.  I also

18    have the disk from the clerk that was issued for

19    30 days.

20      Q.    Did the paperwork have a hearing date?  You

21    know you were entitled to a hearing in court, right,

22    before a judge?

23      A.    We were in front.

24      Q.    Before that was made final, right?

54

```
 1        Q.    And your license.  But you also had this
 2    idea that no matter what, you could get your
 3    father's and your son's guns back?
 4        A.    Yes.
 5        Q.    Why did you think that?
 6        A.    We were told at the end of the 30 days they
 7    could get the guns back from the State Police
 8    barracks.
 9        Q.    And that was -- who was that?  Was that the
10    original judge --
11        A.    No.
12        Q.    -- who issued the 30-day?
13        A.    The State Police told us not to worry about
14    the guns; that they could be transferred to my
15    father and that he could get all of his own guns and
16    my son's guns back.
17        Q.    Now, at the time -- let me just go back to
18    that night, then.  They told you obviously that the
19    court had ordered that you surrender the guns and
20    the license and that as long as that restraining
21    order was in effect, that was the case, that you
22    wouldn't have your guns and you wouldn't have the
23    license?
24        A.    That night they told me that the guns had
```

1  to be surrendered, told me that I was under a

2  restraining order.  But there was no explanations by

3  the police of permitted accusations or anything

4  else.  That was to be left up to the court.

5      Q.   Did they give you a copy of the restraining

6  order, the police?

7      A.   Yes.

8      Q.   And did they give you any other

9  documentation at the same time?

10     A.   Not sure.

11     Q.   Didn't they give you information about your

12 rights and responsibilities regarding the surrender

13 of the guns and the suspension of the license?

14     A.   They had already taken the guns, and they

15 told me I would be getting a notification in the

16 mail to surrender my LTC.  As far as anything else

17 for rights or anything, no, I don't believe so.  I

18 could be mistaken.  I'm unsure.

19     Q.   So they may have given you another piece of

20 paper besides the restraining order?

21     A.   I don't believe they gave me any other

22 documents, no.

23     Q.   But they may have told you some -- given

24 you some more information about the consequences of

1   surrendering your guns?

2        A.    I don't believe so.   They told me that they

3   would be stored there, and I'm positive everything

4   else after that was left to the court.

5        Q.    Did they ever tell you that what happens is

6   governed by, among other things, the law having to

7   do with firearms and the law having to do with

8   restraining orders?

9        A.    They told me under a restraining order that

10  your guns, you have to surrender your guns and

11  surrender your LTC.

12       Q.    And that's under Chapter 209A, which has to

13  do with restraining orders.   Do you recall anyone

14  mentioning 209A?

15       A.    I remember them talking about a restraining

16  order.   I mean, I'm unsure of what law letters are,

17  and numbers.

18       Q.    Do you have any memory what happened to the

19  assault and battery charge?

20       A.    Yes.

21       Q.    What happened?

22       A.    It was thrown out and the judge said that

23  it should have never come before him.

24       Q.    What judge was that?

57

1     A.    Judge Ripps.

2     Q.    So he didn't like the charge, but he

3    maintained the restraining order?

4     A.    Uh-huh.

5     Q.    Did your wife -- are you aware of whether

6    your wife asked not to prosecute the assault and

7    battery?

8     A.    She told me that she never pressed the

9    assault and battery.  The State Police pressed it.

10   When we finally got into court for it, the charge

11   stated that I may have brushed her.  When the judge

12   asked what "brushed" was, she said, "He never

13   touched me in any way," and the judge actually told

14   the DA, "Get this out of here.  This should have

15   never come to court."  And it was just completely

16   wiped out.

17    Q.    But if -- we don't need to go there.  All

18   right.

19          So when this happened, you left your home

20   and you went to your father's house, right?

21    A.    Uh-huh.

22    Q.    And the police took the guns.  Again, I may

23   have already asked this question:  Why did you think

24   that no matter what happened, your father could get

1   his guns back?

2       A.   Well, for one thing, I didn't think it was

3   legal to take someone else's guns.

4       Q.   Did you think it was consistent with the

5   restraining order that they give him his guns back

6   where you were living with him?

7           MR. JENSEN:   Objection.

8       A.   I could have moved.

9       Q.   But at that time, you were going to live

10  with him, right?  You were living with him?

11      A.    Yes.   When I left the guns at my house, my

12  son was licensed to carry firearms.  He lived in

13  that facility.  This was his house as well.  I

14  didn't think the police could take my guns at all

15  with them being locked in the house with a licensed

16  gun owner in the house with them.

17      Q.   Okay, but they were still your guns or

18  still in your house, right?

19      A.   My son's house as well and some were his.

20      Q.   Do you recall actually having this

21  conversation with the police on July 9 or July 10?

22  Did you actually ask them, "Can we give the guns to

23  my father?"

24          MR. JENSEN:   Objection.

1    A.    My mother was in the station that night to

2  get me out of there.  She spoke to them while I was

3  sitting right there.  I specifically remember the

4  conversation where they told my mother, "Don't worry

5  about it.  Your husband will be able to get his

6  guns, and we will be able to take care of the other

7  guns as well.  Right now they are in storage and you

8  don't have to worry about it."

9    Q.    So did the police say anything in response

10 to this idea that they let the father keep the guns?

11 Or that's what they said, "Don't worry.  You will

12 get them back"?

13   A.    They just said, "Don't worry.  You will get

14 them back."

15   Q.    Did you ask the police at any time to

16 transfer the guns to your father?

17   A.    Yes.

18   Q.    Do you recall when?

19   A.    I don't.  It was more than one occasion.

20   Q.    Okay.  In relation to July 9, do you recall

21 roughly when you asked the police to turn the guns

22 over to your father?

23   A.    Maybe within a week I spoke to them, and

24 within the first two weeks or so I had my attorney

1   contact them.

2        MR. JENSEN:  Are you getting close to

3   stopping?  I just ask because it's been like an hour

4   and a half now.

5        MR. MARKS:   I think we are on the down

6   slope.

7        (Recess taken)

8   BY MR. MARKS:

9        Q.   So you, not necessarily on the 9th itself,

10  but you say within a week you asked the State Police

11  to transfer all the guns to your father or just his

12  guns?

13       A.   No, I asked them if he could take mine as

14  well.

15       Q.   And your son's?

16       A.   Yes.

17       Q.   And then you say you retained a lawyer

18  within two weeks, roughly, of July 9?

19       A.   I retained a lawyer on the very first

20  Monday after the incident for my divorce.

21       Q.   Did your father also retain the same

22  lawyer, or was it just you?

23       A.   No.  This just had to do with my divorce.

24       Q.   But you had the lawyer speak to the police?

76

1    stuff was stored correctly.  I know the common laws

2    that I needed to do what I had to do.  I don't open

3    law books to read through actual laws, no.

4         Q.   So you didn't think you needed to know

5    about the laws that governed your possession of

6    guns?

7         A.   I don't know about all the laws for my car

8    either.

9         Q.   All right.  One more piece of paper.  Does

10   this look familiar?

11        A.   Yes.

12        Q.   Did you get this -- did you get this letter

13   from the chief, Adams police chief?

14        A.   Yes, I did.

15        Q.   And did you get this letter before the

16   State Police transferred your guns to Village Gun

17   Shop?

18        A.   I'm not sure on the date.  I would think

19   so, yes.

20        Q.   And this letter, does it not, draws your

21   attention to Chapter 140, Section 129D, correct?

22        A.   Yes.

23        Q.   Which I've been so good as to give you a

24   copy of.  When you got this letter, did you look at

77

1   Chapter 140, Section 129D?

2       A.    No, I did not.

3       Q.    Does this letter tell you that you have to

4   do something in relation to or as required by

5   Chapter 140, Section 129D?

6       A.    Yes.  I had to surrender my LTC.

7       Q.    And does it also say that if you don't

8   comply with Chapter 129D, it's a criminal offense?

9       A.    Yup.

10      Q.    And it also tells you a few other things

11  about what your rights are, correct?

12      A.    Yes.

13      Q.    So you are telling us that even though you

14  got this letter that says 140, Section 129D, you

15  know, is important, you didn't look at it?

16      A.    Access the actual law, no, I did not.

17      Q.    Did you speak to your lawyer and ask him to

18  look at the law?

19      A.    No.  The lawyer was for a divorce, not for

20  the guns.

21      Q.    Did you ever show this letter to your

22  lawyer?

23      A.    I did not.  I just surrendered my LTC like

24  I was told.

1    Q.   And the fact that this letter says that if

2  you don't comply with 129D, you might be committing

3  a criminal offense also didn't cause you to look at

4  129D?

5    A.   No, because I submitted my LTC, so I was

6  not committing a criminal offense.   I was going by

7  the law.

8    Q.   All right.   But if you had looked at 129D,

9  as the letter advises you, you would have seen that,

10  among other things, it suggests that the police have

11  the authority to transfer the guns to a public

12  bonded warehouse.

13      MR. JENSEN:   Objection.

14    A.   But it also again here says that I have the

15  right to transfer them to any other person who

16  lawfully can take possession of such items.

17    Q.   Right.   So there are other things in 129D.

18    A.   But why were my rights stopped, and why was

19  I not allowed to transfer them?

20    Q.   Do you have the names of the State Police

21  Troopers you spoke to?

22    A.   Trooper Canata and Trooper Hoye.

23    Q.   And you had this conversation with them?

24    A.   Yes.

1            MR. MARKS:  Let's mark this letter.

2                 (Document marked as JAJ

3                 Exhibit 7 for identification)

4            MR. MARKS:  Let me look at my notes.  I

5    think I am coming to the end (pause).

6       Q.   Did I get your brother's name?

7       A.   Brian.

8       Q.   Brian Jarvis?

9       A.   Yes.

10      Q.   Where does he live, or where did he live at

11   the time?

12      A.   I think it's 102 North Summer Street.  I'm

13   sure of the North Summer.  I'm not sure of the 102.

14      Q.   In Adams?

15      A.   Yes.

16      Q.   He had a license to carry at the time?

17      A.   Yes.

18      Q.   And he was willing to take all the guns,

19   you say?

20      A.   Yes.

21      Q.   How do you know?  Did you speak to him?

22      A.   I did speak to him several times, yes.

23           MR. MARKS:  I have no other questions.

24   Anyone else?

128

1              C E R T I F I C A T E

2        I, JAMES JARVIS, do hereby certify that I have

3    read the foregoing transcript of my testimony, and

4    further certify under the pains and penalties of

5    perjury that said transcript (with/without)

6    suggested corrections is a true and accurate record

7    of said testimony.

8        Dated at _6-16-14_, this _16_ day of _June_,

9    2014.

10

11                         _James A. Jarvis_

12

13

14

15

16

17

18

19

20

21

22

23

24

DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813

129

1  COMMONWEALTH OF MASSACHUSETTS)

2  SUFFOLK, SS.                )

3      I, Nancy M. Kingsbury, RPR and Notary Public in

4  and for the Commonwealth of Massachusetts, do hereby

5  certify that there came before me on the 7th day of

6  March, 2014, at 2:08 p.m., the person hereinbefore

7  named, who was by me duly sworn to testify to the

8  truth and nothing but the truth of his knowledge

9  touching and concerning the matters in controversy

10  in this cause; that he was thereupon examined upon

11  his oath, and his examination reduced to typewriting

12  under my direction; and that the deposition is a

13  true record of the testimony given by the witness.

14      I further certify that I am neither attorney or

15  counsel for, nor related to or employed by, any

16  attorney or counsel employed by the parties hereto

17  or financially interested in the action.

18      In witness whereof, I have hereunto set my hand

19  and affixed my notarial seal this 18th day of March,

20  2014.

21  Nancy M. Kingsbury

22

23    Notary Public

24    Commission expires 11/5/15

