# ATTACHMENT E

1

Volume I
Pages 1 to 92
Exhibits 1 to 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - -x
RUSSELL JARVIS; JAMES JARVIS;          :
ROBERT CRAMPTON; and                   :
COMMONWEALTH SECOND                    :
AMENDMENT, INC.,                       :
        Plaintiffs,            :
                    :
    -against-                 :   Civil Action
                    :   No.
VILLAGE GUN SHOP, INC. d/b/a           :   1:12-cv-40032
VILLAGE VAULT; and SECRETARY           :
MARY E. HEFFERNAN, in her              :
Official Capacity as                   :
Secretary of the Executive             :
Office of Public Safety and            :
Security,                              :
        Defendants.            :
- - - - - - - - - - - - - - - - - -x

       DEPOSITION OF RUSSELL JARVIS, a witness
called on behalf of Defendant Secretary Mary E.
Heffernan, taken pursuant to the Federal Rules of
Civil Procedure, before Linda A. Walsh, Registered
Professional Reporter and Notary Public in and for
the Commonwealth of Massachusetts, at the Office of
the Attorney General, 10 Mechanic Street, Worcester,
Massachusetts, on Wednesday, May 21, 2014,
commencing at 10:37 a.m.

PRESENT:

    David Jensen PLLC
        (by David D. Jensen, Esq.)
        111 John Street, Suite 420
        New York, NY 10038, for the Plaintiff.
        david@djensenpllc.com
        212.380.6615

(Continued on the next page)

2

PRESENT (Continued):

    Glickman, Sugarman, Kneeland & Gribouski
        (by Wayne M. LeBlanc, Esq.)
        P. O. Box 2917
        Worcester, MA 01609,
        for Defendant Village Gun Shop, Inc.,
        d/b/a Village Vault.
        leblanc@gskandg.com
        508.756.6206

    Office of the Attorney General
        (by David R. Marks, Asst. Attorney General)
        One Ashburton Place, 20th Floor
        Boston, MA 02108,
        for Defendant Secretary Mary E. Heffernan.
        david.marks@state.ma.us
        617.727.2200, ext. 2362

ALSO PRESENT:  M. Lucille Jarvis

                * * * * *

3

<u>I N D E X</u>

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| RUSSELL JARVIS | | | | |
| BY MR. MARKS | 4 | | 86 | |
| BY MR. LEBLANC | | 62 | | |

* * * *

<u>E X H I B I T S</u>

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 1 | License history and details for Russell Jarvis from the Massachusetts Instant Record Check System | 12 |
| 2 | Letter to Dear Resident Firearms Licensee | 15 |
| 3 | Record from the Adams Police Department regarding conversation with Sergeant Clark on July 12, 2010 | 46 |
| 4 | Declaration of Russell Jarvis | 49 |
| 5 | Fax from Village Vault | 54 |

* * * *

4

1              P R O C E E D I N G S

2          MR. MARKS:  We're here for the deposition

3    of Russell Jarvis.  As we spoke at our last

4    deposition, we are going to waive objections, except

5    as to form, and we'll require the witness to read

6    the transcript and give us any corrections.

7          MR. JENSEN:  Okay.

8                    RUSSELL JARVIS

9    a witness called for examination by counsel for the

10   Defendant Secretary Mary E. Heffernan, having been

11   satisfactorily identified by the production of his

12   driver's license and being first duly sworn by the

13   Notary Public, was examined and testified as

14   follows:

15                 DIRECT EXAMINATION

16     BY MR. MARKS:

17       Q.    I'm David Marks, Mr. Jarvis.  I'm an

18   Assistant Attorney General.  I represent the

19   Secretary of Public Safety in this case.

20           So let me just have a little background for

21   you.  What's your address?

22       A.    6 Davis Street, Adams, Mass.

23       Q.    How long have you lived there?

24       A.    49 years.

6

1    firearms.  So I just wanted to start talking about

2    your background and experience with firearms.  Just

3    tell me generally how long you've owned firearms.

4    When did you start?  How did you start?

5         A.    I lived on a farm.  That's how we survived,

6    by firearms.  My father owned them.

7         Q.    Do you remember how old you were when you

8    started using firearms?

9         A.    Yes.  About nine.

10        Q.    What did you do then?

11        A.    Target practice.

12        Q.    Target practice?

13        A.    Hunted.

14        Q.    Do you remember when you first got your own

15   firearm?

16        A.    Yes.  1957.

17        Q.    What was it?

18        A.    It was a .22 automatic semiautomatic.  I

19   think it was a Stevenson.  Don't quote me.  It's a

20   long time ago.

21        Q.    Is that a handgun or a --

22        A.    No, rifle.

23        Q.    Rifle.  Do you know when you first got

24   licensed to have firearms?

7

1    A.    Oh, God.  Well, you didn't need a license

2    on a farm.  I would say 16.

3    Q.    So that would have been roughly --

4    A.    1955.

5    Q.    Who did you learn how to use guns from?

6    A.    My dad.

7    Q.    Did he teach you the rules?

8    A.    Yes.

9    Q.    And did he --

10    A.    Don't shoot nothing you can't eat.

11    Q.    What else did he teach you?

12    A.    Everything else about guns.

13    Q.    That included safety rules?

14    A.    Yes, yes.

15    Q.    What about -- how did you learn about the

16    laws regarding guns?

17    A.    I had it growing up through the years.  You

18    get law books, fish and game books.  I mean, that

19    told you just about everything you wanted to know.

20    Q.    So you got some law books or some fish and

21    game books?

22    A.    Yes, fish and game books.  I think I have

23    still got some from back in the '60s.

24    Q.    Do you remember the names of any of them or

1   who published them?

2      A.   Commonwealth of Massachusetts.

3      Q.   So you were aware at some point that not

4   only were there safety rules regarding, you know,

5   possession/use of guns, but that there were laws

6   regarding possession/use of guns that you had to

7   comply with, right?

8      A.   Right.

9      Q.   Do you have any records of the guns that

10  you've owned over the years?

11     A.   I just showed him some of the guns I had.

12     Q.   So you have some records?

13     A.   Yes.

14     Q.   I assume you don't have --

15     A.   I don't have them all.

16     Q.   -- documentation?

17     A.   I had a lot of them in the safe and it was

18  broken into, and all that stuff is gone.

19     Q.   When you say the safe was broken into, how

20  did this happen?

21     A.   November.

22     Q.   Was this when the police took them?

23     A.   No.

24     Q.   It was a break-in?

12

It said, "Issue Date, 7/28/2010."

    A.    To 2015, yes.

    Q.    Right, to 2015.

    A.    Yes.

    Q.    So that's the one you still have?

    A.    Yes.

    Q.    Now, have you --

        MR. MARKS:  Why don't we mark this.

               (Document marked as R. Jarvis

               Exhibit 1 for identification)

    Q.    Have you ever had a License to Carry
expire?

    A.    Yes.

    Q.    Do you recall when that happened?

    A.    I would say 2006.

    Q.    Do you recall what happened?

    A.    Would you like to have me give you the
reason why?

    Q.    Sure.

    A.    I had prostate cancer and I had 36 bouts of
radiation the year later, and I don't think I needed
a license then, and then I had heart congestion
failure.  So buying a license wasn't one of my big
things then.  I didn't know one day to the next what

13

I was going to do.

Q.    So during that time your license expired,
you were not paying attention to it?

A.    Right.   I would say three or four years.
Yes, 2010.

Q.    So does this, if we look at what's been
marked Exhibit 1, it seems to reflect what you're
saying.   The second entry, the second license has as
an expiration date of 12/8/2006 and then the next
one -- which happens to be your birthday, right?

A.    Right.

Q.    And then the next one was issued July 28,
2010?

A.    Right.

Q.    So it looks like for roughly four years you
didn't have a license?

A.    That's very possible.

Q.    And that is consistent with your memory
of --

A.    Right.

Q.    -- of your health problems?

A.    Yes.

Q.    So do you recall -- when your license
expired in December 2006, do you recall getting any

18

1    forth.

2        Q.    Do you recall, you know, how long you spent

3    in Florida each year over the years?

4        A.    Well, I used to go in the end of December,

5    but now we go in September.

6        Q.    September?

7        A.    Yes.  To May.

8        Q.    Really?

9        A.    May 2nd, May 3rd.

10       Q.    When did you start going for that long?

11       A.    I wouldn't really know.  I'd be guessing.

12   Maybe 2009, 2008.  Time don't mean much anymore.

13       Q.    It happens.

14             What did you do when you wanted to get one

15   of your guns out of your son's house?

16       A.    Just open the door up -- I knew where the

17   key was -- and just took what I wanted.

18       Q.    So you, I guess, had an agreement with your

19   son that you could go in his house and take your

20   guns?

21       A.    Yes.  He had with me the same thing.

22       Q.    I assume this gun room was locked as well,

23   right?

24       A.    Yes, all the time.

1      Q.    And I assume you and James at least had --

2   how was it locked?  Was it a key or a combination?

3      A.    A key.

4      Q.    Both you and he had the key?

5      A.    Right.

6      Q.    Did you have access to all of the guns in

7   the --

8      A.    Yes.

9      Q.    -- in the gun room?

10     A.    Yes.

11     Q.    Even if any particular gun didn't, you

12   know, technically belong to you?

13     A.    Yes.

14     Q.    You could use it?

15     A.    Yes.

16     Q.    So that was also an agreement you had with

17   your son?

18     A.    Yes.

19     Q.    Was it the same for him --

20     A.    To me.

21     Q.    -- he could use any of your guns?

22     A.    Yes, right.

23     Q.    So is it fair to say you shared all the

24   guns?

20

1      A.    All the guns, all the ammo.

2      Q.    And this was true even though you didn't

3  live in the same house?

4      A.    Right.

5      Q.    Do you recall when -- I think that for a

6  period of time your son had a Firearm Identification

7  Card, right, an FID Card, and then at some point he

8  applied for and got a License to Carry.  Do you

9  recall when he got a License to Carry?

10     A.    Not really.  I would say -- a License to

11  Carry, I mean, he had to have -- he went hunting

12  with me so....

13     Q.    Well, he could go hunting with you with an

14  FID Card, right?

15     A.    Right.  But he had -- to tell you the

16  truth, I don't really know.  I wouldn't even want to

17  speculate.  I mean, we allowed each other to take

18  guns, but I didn't run his life.

19     Q.    I think I know the answer to this, but at

20  the time that he lived in Cheshire where you put the

21  gun room, did he always have a License to Carry; do

22  you recall?

23     A.    I would say so.  I wouldn't really know.

24     Q.    Do you recall that at some point in time he

29

1    with them."

2       Q.    Did Dave's Sporting Goods tell you what

3    they would do with the guns if -- or what they would

4    have done with the guns if he had just left them

5    with him?

6       A.    No, they did not.

7       Q.    Let's talk about -- by the way, did

8    you -- when you made this gun cabinet -- this gun

9    room at your son's house, did you store all of your

10   guns there?

11      A.    Yes.

12      Q.    Did that include both rifles and shotguns

13   and handguns?

14      A.    And black powder.

15      Q.    So rifles, shotguns, handguns, black

16   powder?

17      A.    Right.

18      Q.    From the first time that, you know, you

19   built the room?

20      A.    Everything was stored there.

21      Q.    So let's talk about James's arrest July 9th

22   of 2010.  Tell me, you know, when you first heard

23   about it, what you heard, who told you.

24      A.    About what?

1    restraining order still on your son?"  I says,

2    "Yes."  He said, "Well, I can't give them back to

3    you."  He said, "They are right down there in that

4    back room safe in the vault," and he said, "That's

5    where they are going to stay until the restraining

6    order is lifted."

7         Q.    Now, at this point your son is not living

8    in his house in Cheshire anymore, right?

9         A.    No, he is not.

10        Q.    Where is he living?

11        A.    Furnace Hill in Cheshire.

12        Q.    Well, after he was arrested and the

13   restraining order was issued in July of 2010, where

14   did he move?

15        A.    My house.

16        Q.    Your house.  Did the police know he was

17   living at your house?

18        A.    I would say so, yes.

19        Q.    How long did he live at your house?

20        A.    Maybe two years.

21        Q.    That, again, is 6 Davis Street?

22        A.    Yes.

23        Q.    So for two years after July 9th of 2010

24   your son lived in your house, James?

37

1        A.    I would say somewheres around there, in

2    that area, yes.   Two years, yes.

3        Q.    And there was a restraining order against

4    your son that prevented him from possessing the guns

5    or having a license, correct?

6        A.    I don't think they ever took his license.

7        Q.    In fact, they did take his license because

8    we have, among other things, a letter from both the

9    Adams Police Department and the Cheshire Police

10   Department suspending his license.

11       A.    I didn't know that.

12       Q.    Here, for example.

13       A.    No, I didn't know it (referring to

14   document).   Were they supposed to pull his FID Card

15   out of his wallet?

16       Q.    Without regard to what he was supposed to

17   do with it, the restraining order took his guns from

18   him and resulted in the suspension of his license,

19   correct?

20       A.    If that's, you know, that's what occurred.

21   I don't know.

22       Q.    Well, you know the guns were taken because

23   of the restraining order?

24       A.    Right.

40

1   had the FID Card on him, the Pistol Permit.

2       Q.   Did you assume that he was not allowed to

3   have guns during that time because of the

4   restraining order?

5       A.   I didn't know.

6       Q.   You were still allowed to have guns, right?

7       A.   Yes.

8       Q.   Did you have any guns during that time in

9   your house?

10      A.   No.

11      Q.   Now, if the restraining order prevented him

12  from possessing guns and the police told you when

13  you went to talk about how you could get your guns

14  back, the police told you there was a restraining

15  order, do you think that's why they didn't give you

16  the guns back?

17      A.   I would say so.

18      Q.   Right.  Because he was living in your

19  house?

20      A.   It doesn't matter.  I could have stored

21  those guns anywhere.

22      Q.   Did you tell the police you were going to

23  store your guns elsewhere?

24      A.   No, I didn't.

41

1     Q.    Okay.  Did you tell the police that you
2   wanted to transfer the guns to anyone?

3     A.    No.

4     Q.    But it made sense to you, shall we say,
5   that as long as there was a restraining order
6   against James having guns and as long as he was
7   living in your house, the police were not going to
8   give his guns or your guns back to you to be in your
9   house?  That made some sense to you?

10     A.    Yes.  They weren't going to be at my house.

11     Q.    Now, at the time that you -- at the time
12   that you went to the police, the State Police, three
13   to four weeks after July 9th and you asked for your
14   guns back, did you have a License to Carry?

15     A.    I would say no.

16     Q.    Why not?

17     A.    The same reason, health problems.  I didn't
18   think I was going to need one.

19     Q.    On July 9th, 2010, when they seized the
20   guns, you did not have a valid License to Carry?

21     A.    Right.

22     Q.    And you think that -- and that's because it
23   had expired?

24     A.    Right.

42

1       Q.    And you think that when you went to the
2   State Police later in July, you still did not have a
3   valid License to Carry?
4       A.    Right.
5       Q.    Did you know that at the time?
6       A.    That I didn't have what?  A valid license?
7   Yes.
8       Q.    Did you tell the police?
9       A.    No.
10      Q.    Did they ask?
11      A.    No.
12      Q.    So that would have been another good reason
13  that they couldn't give you the guns, though, right?
14      A.    They didn't know that.
15      Q.    But they couldn't give you the guns if you
16  didn't have a license?
17      A.    My grandson did.
18      Q.    You said you went -- you said you went to
19  the State Police and asked them to give you the guns
20  back --
21      A.    Right.
22      Q.    -- your guns back?
23      A.    That's why I took my grandson because he
24  had a license.

43

Q.   Okay.  And what did that have to do with

anything?  I thought you were looking for your guns

back.

A.   Right.  But if he could get them back,

they're still my guns.  They are going to be his

guns some day.

Q.   But I thought you also just told us that

you did not tell the police you were going to store

the guns anywhere other than your house, right?

A.   Right.

Q.   And I thought you just said that you didn't

ask the police or you didn't tell the police you

wanted to transfer the guns to anyone else?

A.   Right.

Q.   So what did your grandson have to do with

this?

A.   He lived at his own house.

Q.   Did you tell the police, "I want to give

them to my grandson"?

A.   No.

Q.   Okay.  So, again, if you didn't have a

License to Carry -- a valid License to Carry at the

time, which you didn't, that, again, would have

justified the police in not returning the guns to

44

1  you, correct?

2      A.   If they knew I didn't.

3      Q.   Well, even if they didn't know it.  You

4  weren't allowed to have guns if you didn't have a

5  valid License to Carry, correct?

6      A.   Right.

7      Q.   So all I'm asking you is whether in

8  hindsight it made sense that the police not give you

9  those guns back if you did not have a then current

10  valid License to Carry?

11      A.   If they knew it, yes.

12      Q.   All right.  Even if they didn't know it,

13  could they have given you the guns back?

14      A.   My grandson was there to get them back.

15      Q.   Could they have given you the guns back,

16  not your grandson, you?

17      A.   No, they wouldn't have gave me the guns.

18      Q.   Right, they couldn't have given you the

19  guns?

20      A.   Right.

21      Q.   If they knew it or not, they couldn't have

22  given you the guns?

23      A.   Right.

24      Q.   Okay.  When did you get your license

54

MR. MARKS:  Could we just mark this.

(Document marked as R. Jarvis

Exhibit 5 for identification)

A.    But the guns were already removed then.

Q.    So let me just ask you about his access.
If you grandson wanted to use his guns that were
stored in your son's gun room, how did he get it?

A.    He lived there.

Q.    So say in July of 2010 he lived with your
son --

A.    He lived with my son.

Q.    -- in Cheshire?

A.    Yes.

Q.    Did he have a key to the gun room, your
grandson?

A.    We had three keys.  One was hidden.

Q.    And did he have the same rights to access
and use all the guns like you and your son?

A.    Yes.

Q.    Now, your declaration, Exhibit 4, also says
that at some point you spoke to someone at Pete's
Gun Shop?

A.    Pete's, yes.

MR. JENSEN:  Hold on.

55

1      Q.    Page 4, Paragraph 17.

2      A.    (Witness reviews document)  Yes.

3      Q.    Let me just ask you this:  Is it fair to

4  say that even though you may have considered certain

5  guns your own or you may have purchased the guns

6  yourself, the three of you essentially shared all

7  the guns?

8      A.    Right.

9      Q.    And you considered, since you had gotten

10 guns from your father, that at some point the guns

11 would go to your son and then your grandson?

12     A.    Right.

13     Q.    So basically you considered all the guns

14 all of your -- both your and your son's?

15     A.    It was family shared.

16     Q.    Okay.  When you went to -- now I'm going

17 back to Paragraph 17.

18          When you went to Pete's Gun Shop after your

19 visit to the State Police barracks, do you recall

20 who you spoke to?

21     A.    He was assistant to Mr. Decker.  He said

22 Mr. Decker was on vacation.  I think he's in Maine.

23     Q.    You don't remember what his name was?

24     A.    No.  My son does.  I didn't pay no

61

1   you do anything about making sure that you knew what

2   the laws regarding firearms possession carrying were

3   at that point in time?

4        A.    Not really.

5        Q.    But you knew that at some point --

6        A.    Through the year, yes.

7        Q.    So you knew that at some point laws had

8   changed --

9        A.    Oh, yes.

10       Q.    -- regarding possession and carrying

11  firearms?

12            Did you know that at some point, for

13  example, how long a Firearm Identification Card was

14  valid for changed?

15       A.    Right.

16       Q.    What was that change?

17       A.    It changed to four years.

18       Q.    From?

19       A.    It was two, I think, for a long time, and

20  then it changed to four.  And then when I got to 70,

21  this was free (indicating).

22       Q.    So you didn't have to pay for this?

23       A.    Right.

24       Q.    Again, you knew that it was important for

62

1    you to know the laws regarding firearms if you were

2    going to be licensed, right?

3        A.    Yes, yes.

4        Q.    You knew that if you didn't comply with the

5    laws, among other things, there was potential

6    criminal penalties, right?

7        A.    Yes.

8        Q.    As a responsible gun owner, you knew it was

9    important to know the laws and follow them?

10       A.    Yes.

11           MR. MARKS:   I have no other questions.

12   Your witness.

13                   CROSS EXAMINATION

14       BY MR. LEBLANC:

15       Q.    Okay.  Mr. Jarvis, I'm Attorney Wayne

16   LeBlanc.  I represent the Village Gun Shop, the

17   Village Vault of which you brought suit against with

18   Mr. Crampton and with your son James.  I have a few

19   questions for you that will center primarily around

20   your relationship and situation with my client.

21           And so I've noticed that in your complaint

22   there is an indication that both you and your son

23   James made repeated attempts to have the firearms

24   and ammunition that you had with the police

92

1   COMMONWEALTH OF MASSACHUSETTS)

2   SUFFOLK, SS.                   )

3       I, Linda A. Walsh, RPR and Notary Public in and

4   for the Commonwealth of Massachusetts, do hereby

5   certify that there came before me on the 21st day of

6   May, 2014, at 10:37 a.m., the person hereinbefore

7   named, who was by me duly sworn to testify to the

8   truth and nothing but the truth of his knowledge

9   touching and concerning the matters in controversy

10  in this cause; that he was thereupon examined upon

11  his oath, and his examination reduced to typewriting

12  under my direction; and that the deposition is a

13  true record of the testimony given by the witness.

14      I further certify that I am neither attorney or

15  counsel for, nor related to or employed by, any

16  attorney or counsel employed by the parties hereto

17  or financially interested in the action.

18      In witness whereof, I have hereunto set my hand

19  and affixed my notarial seal this 5th day of June,

20  2014.

21

22  *Linda A. Walsh*

23  Notary Public

24  Commission expires 3/5/2015



DORIS O. WONG ASSOCIATES, INC.
(617) 426-2432 ~ Fax (617) 482-7813