UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
RUSSELL JARVIS; JAMES JARVIS;       )
ROBERT CRAMPTON; and COMMONWEALTH   )
SECOND AMENDMENT, INC.              )
                                    )
                Plaintiffs,         )
                                    )      CIVIL ACTION
           v.                       )      NO. 1:12-40032-JLT
                                    )
VILLAGE GUN SHOP; and SECRETARY     )
ANDREA CABRAL, in her Official      )
Capacity as Secretary of the        )
Massachusetts Executive Office of   )
Public Safety and Security,         )
                                    )
                Defendants.         )
_____ )

YOUNG, D.J.                                    October 15, 2014

<u>MEMORANDUM AND ORDER</u>

## I.  Introduction

The Plaintiffs James Jarvis, Russell Jarvis, Robert
Crampton, and Commonwealth Second Amendment Inc. ("the Owners")
bring this 42 U.S.C. § 1983 action against the defendants
Village Gun Shop and Andrea Cabral, Secretary of the
Massachusetts Executive Office of Public Safety and Security.
The Owners allege that Secretary Cabral and Village Gun Shop
violated their Fourteenth Amendment rights to due process of the
law.  The Owners move for partial summary judgment, asking the

Court to rule that Village Gun Shop is a state actor, and it may be liable under section 1983 for damages stemming from a violation of due process.

## II.  Legal Framework

### A.    Relevant Statutory Framework for Firearm Ownership in Massachusetts

Massachusetts law requires that an individual obtain a Firearms Identification Card in order to possess, transfer or carry a firearm.  Mass. Gen. Laws ch. 140, §§ 129B, 129C.  A Firearm Identification Card can be suspended or revoked under specific circumstances defined by statute.  See Id. at §§ 129B, 131(d),(f).  Additionally, a Firearms Identification Card expires if not renewed within the time required by statute.  Id. at §§ 129B, 131(i).

If a Firearms Identification Card is suspended or revoked the former card holder must surrender all firearms and the police are authorized to confiscate both the invalid card and any weapons the previous card holder possesses.  See Id. at §§ 129B, 131(m). Once the owner surrenders the firearms, he or she may arrange for the property to be sold or transferred to a licensed person.  Id. at § 129D.  The police must hold the seized firearms for one year, but they are not required to maintain physical possession of the firearms for that entire year.  Id.  The police may transfer the firearms to a licensed

bonded warehouse for storage.  Id.  Upon transfer, the bonded

warehouse must: inspect the item, issue the owner a receipt

identifying the item as required by statute, and store the items

in accordance with licensing and statutory requirements.  Id.

Upon transfer to the bonded warehouse, the property owner

becomes liable for "reasonable" storage fees.  Id.  If the owner

has not paid the fees for ninety days, and fails to arrange for

a lawful transfer of the property, the bonded warehouse may

auction the property to recover its fees.  Id.

## A.   Summary Judgment

The Owners ask this Court to grant partial summary judgment

and rule that Village Gun Shop is a state actor and is thus

liable for any violation of the Owner's Fourteenth Amendment

right to due process.  Pls. Mem. Law Supp. Partial Summ. J.

Against Village Gun Shop, Inc. ("Pls.' Mem.") 1, ECF No. 33.

"The court shall grant summary judgment if the movant shows that

there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56.  "Only disputes over facts that might affect the outcome

of the suit under the governing law will properly preclude the

entry of summary judgment."  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 248 (1986).  The facts recounted below – on which

the Court bases its decision – are undisputed.

## III. Factual Background

### A.   James Jarvis

James Jarvis ("James") is a gun owner residing in Cheshire, Massachusetts.  Pls.' Statement Undisp. Material Facts ("Pls.' Facts") ¶ 1, ECF No. 34.  Prior to July 9, 2010, James held a valid Firearm Identification Card.  Am. Compl. 7, ECF No. 5.  On July 9, 2010, Massachusetts State Police arrested James for assault and battery on his wife.  Def. Sec'y Pub. Safety Statement Mat. Facts Resp. Pls.' Statement Material Facts("Def's Facts") ¶ 6, ECF No. 66.  On the same day, the North Adams District Court issued a temporary order of protection.  Pls.' Facts ¶ 19.  As a result of the restraining order, pursuant to state law, the police seized over thirty firearms, ammunition, and other weapons present at James's residence. Pls.' Facts ¶ 33; Def.'s Facts ¶ 6.  Additionally, on July 9, 2010, James appeared in the North Adams District Court, where a judge reviewed the restraining order issued that same morning.  Def.'s Facts ¶ 8.  The judge extended the order of protection until August 9, 2010, and set a hearing for that date.  Id.

James appeared at the August 9, 2010 hearing, represented by counsel.  Id. at ¶ 9.  The judge again extended the order of protection for approximately one year until August 2, 2011.  Id. Although James had been a licensed firearm carrier, his license was revoked as a result of the restraining order.  Pls.' Facts ¶

4

5.  Pursuant to Mass. Gen. Laws ch. 209A, § 3B, state police seized the firearms present at James's home.  Id. at ¶ 22. Additionally, the police notified James in writing that due to the restraining order, his Firearms Identification Card was suspended, and section 129D applied to the seizure of his firearms.  Def. Sec'y Pub. Safety's Mem. Opp'n Pls.' Mot. Partial Summ. J. Against Village Gun Shop, Inc. d/b/a Village Vault ("Def's Mem. Opp'n") 6, ECF No. 65.  Police held the seized firearms until August 11, 2010, at which time they transferred the firearms to Village Gun Shop, a licensed bonded warehouse operating in Northboro, Massachusetts.  Pls.' Mem. 5; Pls.' Facts ¶ 49.

Village Gun Shop received James's seized firearms from the police on August 11, 2010.  Pls.' Facts ¶ 49.  On that same day, Village Gun Shop sent James a receipt of the inventoried items and a written policy governing the associated fees.  Def.'s Mem. Opp'n 7.  James did not pay, however, and storage fees accrued totaling $5,634.25.  Pls.' Mem. 8; Pls.' Facts ¶¶ 47, 48. Village Gun Shop sent James written notice that the firearms would be auctioned to cover the storage fees if he failed to pay.  Def.'s Mem. Opp'n 7.  Village Gun Shop auctioned the firearms on May 21, 2011, and September 24, 2011, for a total of $2,695, and billed James $2,939.25 for the outstanding storage fees.  Pls.' Mem. 7, 8; Def.'s Mem. Opp'n 7.

### B.   Russell Jarvis

Russell Jarvis ("Russell") is a gun owner residing in Adams, Massachusetts.  Pls.' Facts ¶ 2.  Russell is James's Father, and stores his firearms in a locked gun cabinet at James's residence in Cheshire, Massachusetts.  Pls.' Facts ¶¶ 3, 11.  The firearms seized on July 9, 2010, included firearms purportedly owned by Russell.  Pls.' Facts ¶ 22.

After his firearms were seized in connection with the restraining order on James, Russell claims to have spoken with the police concerning the return of his firearms.  Pls.' Mem. 7, 8; Def.'s Mem. Opp'n 6.  At the time, however, Russell was not licensed to carry firearms, and therefore the police were unable to return the weapons to him.  Def.'s Mem. Opp'n 6. Additionally, James had moved into Russell's house in Adams, Massachusetts, and the weapons could not be transferred to that location as long as the restraining order was in effect.  Id.

Neither party claims that Russell was ever billed directly for firearms storage.  Nonetheless, Russell refused to pay Village Gun Shop's storage fees, claiming that Village Gun Shop had no right to charge the fees.  Pls.' Facts ¶¶ 47, 48.  His firearms were auctioned along with James's on May 21, 2011, and September 24, 2011.

C.   **Robert Crampton**

Robert Crampton ("Crampton") is a resident of Tewksbury, Massachusetts.  Pls.' Facts ¶ 37.  Crampton held a Firearms Identification Card issued to him in the 1970's.  Def.'s Facts ¶ 42.  The license stated that it was "valid unless revoked." Pls.' Facts ¶ 44.  Crampton, however, moved away from Massachusetts for some time, and when he returned the law had been amended to require renewal of all Firearm Identification Cards.  Pls.' Facts ¶ 44; see also 1998 Mass. Acts ch. 312, § 73, codified as amended at Mass. Gen. Laws ch. 140, § 129(b)(9). Crampton did not renew his original Firearm Identification Card. Def.'s Facts ¶ 44.

In April 2010, Crampton contacted Tewksbury Police in connection with the alleged robbery of his home.  Pls.' Facts ¶ 41.  Police responded to Crampton's call and, in the course of their investigation, became aware of Crampton's firearms. Def.'s Facts ¶ 45.  The police requested his Firearms Identification Card, and Crampton presented them with the expired card.  Id. at ¶ 45.  On June 2, 2010, the Tewksbury Police seized Crampton's firearms due to the fact that he no longer had a valid license to possess them.  Pls.' Facts ¶ 46. The police held the firearms until November 15, 2010, at which time the items were transferred to Village Gun Shop for storage. Id. at ¶ 53.

Village Gun Shop received Crampton's firearms from police on November 15, 2010.  Pls'. Mem. 5.  Village Gun Shop issued a receipt and fee policy to Crampton.  Id. at 6.  Crampton accrued storage fees of $586.  Id. at 8.  When Crampton's storage bill remained unpaid, Village Gun Shop auctioned the firearms for $185, and billed Crampton for the remaining $401 storage fee. Id.

### D.   Commonwealth Second Amendment, Inc.

Commonwealth Second Amendment, Inc. is a non-profit organization with its principal place of business in Natick, Massachusetts.  Am. Compl. 3.  It asserts that the purpose of the organization is research, education, publication, and legal action concerning Second Amendment rights.  Id. at 11. Commonwealth Second Amendment further claims that the organization has expended significant resources assisting members whose firearms are held in bonded warehouses, including Village Gun Shop, pursuant to Massachusetts General Laws chapter 140, section 129D.  Id.

## IV.  Analysis

The Owners filed this action pursuant to 42 U.S.C. § 1983, claiming that they experienced a deprivation of their Fourteenth Amendment right to due process.  Am. Compl. 5.  Specifically, the Owners claim that they were forced to pay storage fees without sufficient notice, and were permanently deprived of

8

their firearms without opportunity for a hearing.  Pls.' Mem. 2-3.  In this motion for partial summary judgment, the Owners ask the Court to rule that Village Gun Shop is a state actor for the purposes of this section 1983 action, and that Village Gun Shop is liable for damages accrued from the alleged due process violation.  Id.

## A.   Stating a Claim Under 42 U.S.C. § 1983

"To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged depravation was committed by a person acting under the color of state law." West v. Atkins, 487 U.S. 42, 49-50 (1988).  The Owners allege a violation of their Fourteenth Amendment right to due process.  Am. Compl.  Because this right is constitutional in nature, the first element of section 1983 is satisfied.

The Constitution secures rights and protections for the individual against government action.  Lugar v. Edmondson, 457 U.S. 922, 922-23 (1982).  Only the state, or an individual acting in an official capacity, can violate individual constitutional rights.  Id.  Private individuals and organizations, however, may also infringe on a protected right when acting on behalf of the state.  Id. at 929.  The Owners allege that Village Gun Shop, although a privately owned business, functioned as a state actor when it assessed fees for

storage and ultimately auctioned the seized firearms.  Am.
Compl. 12.  Specifically, the Owners allege that Village Gun
Shop deprived them of due process by assessing fees without
prior notice and permanently deprived them of their firearms at
auction with no opportunity for a hearing.  Id.  Because Village
Gun Shop cannot be liable for claims under section 1983 unless
it is considered a state actor, this Court must first determine
whether Village Gun Shop is a state actor within the meaning of
section 1983.

### 1.   State Action Under Section 1983

The Supreme Court has articulated several tests for
determining whether a private party is a state actor for the
purposes of section 1983.  Lugar, 457 U.S. at 937.  These tests
include: the state compulsion test, Adickes v. S.H. Kress & Co.,
398 U.S. 144 (1970); the nexus test, Jackson v. Metropolitan
Edison Co., 419 U.S. 345 (1974); the public function test, Marsh
v. Alabama, 326 U.S. 501 (1946); and the joint action test,
Flagg Brothers Inc. v. Brooks, 436 U.S. 149 (1978).  Courts
often use a combination of these tests or refer to several tests
interchangeably.  See, e.g., Estades-Negroni v. CPC Hospital San
Juan Capestrano, 412 F.3d 1 (1st Cir. 2005) ("We have employed
the following three tests to determine whether a private party
fairly can be characterized as a state actor: the state
compulsion test, the nexus/joint action test, and the public

function test."). In order fully to address the issue, this
Court conducts its analysis under each of these tests.

### a.   State Compulsion Test

The state compulsion test asks whether the state requires
or compels a private party to act in a way that violates a
constitutionally protected right.  _Adickes_, 398 U.S. at 169. The
Supreme Court confronted this issue in _Adickes_ when it addressed
a state law that required restaurants to maintain segregated
seating and therefore discriminate on the basis of race.  _Id._
The _Adickes_ court held "that a State is responsible for the
discriminatory act of a private party when the State, by its
law, has compelled the act." _Id._ at 170.  Because the
restaurant was compelled to discriminate on the basis of race by
law, the Supreme Court held that they were state actors and thus
could be liable for violating the Constitution by way of this
discrimination.  _Id._

This test is an inappropriate fit in the present case
because state law does not require or compel Village Gun Shop to
act.  Village Gun Shop may seek a license to provide bonded
warehouse services, but the law does not require it to do so.
The police have a number of bonded warehouses to choose from,
and a facility affirmatively must seek a license to provide
bonded warehouse services.  Am. Compl. 1, 3.  Village Gun Shop
was not compelled by the state to obtain a license or provide

firearm storage services; therefore, Village Gun Shop cannot be considered a state actor under the state compulsion test.  Id.

### b.   Nexus Test

The nexus test asks "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." Jackson, 419 U.S. at 351. In Jackson, the defendant was a privately owned electric company, certified by the State of Pennsylvania to provide electric services to the city of York, Pennsylvania.  Id. at 346.  Pursuant to the agreement between the State and the defendant, the company reserved the right to discontinue service with "reasonable notice."  Id.  The plaintiff, Jackson, was a resident of York and an electric services customer.  Id.  The electricity account at her residence, however, was in another resident's name.  Id.  After several months of unpaid electric bills, the defendant sent employees to the residence to inquire as to the whereabouts of the individual listed on the account. Id.  The employees returned the following day, and Jackson requested that the account be transferred to another name.  Id. Rather than transfer the account, the defendant closed the account, and the electricity was turned off with no further notice.  Id.

In <u>Jackson</u> the Supreme Court held that the defendant was not a state actor for the purposes of a section 1983 action. <u>Id.</u> at 354.  The Court rejected Jackson's argument that holding a monopoly over a specific, widely used service created a sufficient nexus between government and private action to warrant a ruling that the defendant was a state actor.  <u>Id.</u> Specifically, the Court noted that the State did not interfere with the charges and rate increases levied by the company, nor was the state involved in the general business practices of the company.  <u>Id.</u>  Additionally, the Court held that the fact that a private entity is highly regulated by the State does not by itself convert that entity into a state actor.  <u>Id.</u>  The Court reasoned that many private entities are subject to heavy government regulation, and the fact that a company is subject to regulation is not sufficient to answer the controlling question whether there is a sufficient nexus between the state and the private entity.  <u>Id.</u>

Here the nexus between Village Gun Shop and the State is more attenuated than the nexus the Supreme Court found insufficient in <u>Jackson</u>.  While the <u>Jackson</u> Court stated that a private company's monopoly over an industry is not dispositive of state action, Village Gun Shop does not even have such a monopoly.  Pls.' Mem.  Additionally, although Village Gun Shop is licensed as a bonded warehouse and regulated by the State,

the Court in Jackson found the existence of state regulation to be insufficient grounds for finding state action.  Finally, like the defendant in Jackson, Village Gun Shop is free to set its own fee schedule and govern its own business practices which have not been challenged by the State.  Pls'. Mem. 3.  Village Gun Shop does provide a service that is authorized and regulated by state law.  This, however, does not create a sufficient nexus between the State and Village Gun Shop to warrant a ruling that Village Gun Shop is a state actor under the nexus test.

### c.    Public Function Test

The public function test looks to whether the private entity provides a service that exists "primarily to benefit the public and [whose] operation is essentially a public function." Marsh, 326 U.S. at 506.  If the service performed is traditionally one that the State undertakes, then it can fairly be described as a public function.  Santiago v. Puerto Rico, 655 F.3d 61, 69 (1st Cir. 2011).  The Supreme Court, however, has discerned but few private company functions that rise to the level of public functions and therefore create liability for constitutional violations.  These few functions include "the administration of elections, the operation of a company town, eminent domain, peremptory challenges in jury selection, and, in at least limited circumstances, the operation of a municipal

14

park." _Perkins_ v. _Londonderry Basketball Club_, 196 F.3d 13, 19 (1st Cir. 1999).

The Supreme Court found state action in _Marsh_ v. _Alabama_ where the entire town of Chickasaw was owned by a private company.  326 U.S. at 506.  The company exercised extensive control over the town's municipal functions and also paid the town sheriff's salary.  _Id._  The Court held that because the company preformed many traditional government functions, the company was a state actor under the public function test when it infringed the First Amendment rights of a Jehovah's Witness resident who wished to distribute literature on the sidewalks. _Id._

Conversely, the Court found no state action in _Rendell-Baker_ v. _Kohn_. 457 U.S. 830, 831-32 (1982).  In _Rendell-Baker_, the defendants operated a private school that received state funding and provided schooling to maladjusted students.  _Id._ Several teachers brought an action claiming that the school had violated several of their constitutional rights in connection with their discharge.  _Id._  The Court held as a preliminary matter that the school did perform the public function of providing education to certain students.  _Id._ at 842.  Simply because a private entity provides a service to the public, however, does not make them a state actor.  _Id._  The Court reasoned that education of students outside the public school

system was not a service traditionally provided by the state, and the legislature's recent decision to provide funding for alternative schools was evidence of the State's new involvement. Id.

The First Circuit relied heavily on Rendell-Baker in a case applying the public function test to a private busing company providing school busing services.  Santiago v. Puerto Rico, 655 F.3d 61 (2011).  The Santiago Court reasoned that busing, like alternative education, had long been supplied by private entities, and therefore could not be considered a traditional government function.  Id. at 69.  Similarly, the First Circuit applied the public function test in a gender discrimination case against a youth basketball league.  Perkins, 196 F.3d at 13. Again the Court held that youth sports were not a service traditionally provided by the states, and therefore the basketball league was not a state actor.  Id. at 19.

Village Gun Shop does provide a service to the public. Firearm storage, however, is not a service traditionally provided by the state.  The firearms in question are not being held as evidence, a function arguably reserved to the police. Under section 129D the police must hold the firearms for up to one year, but they are not obligated to retain physical possession for the entire period, as the owner may retrieve them with a valid Firearms Identification Card or transfer them to a

licensed third party.  Mass. Gen. Laws ch. 140, § 129D.  The
Owners may remove or transfer their property, or may conceivably
choose to store firearms beyond the one year period if they find
that the arrangement meets their needs.

The service that Village Gun Shop provides does not rise to
the level of government activity found in election
administration, privately owned towns, or corporately held
highways.  Terry v. Adams, 345 U.S. 461 (1953); Marsh, 326 U.S.
501; South Carolina State Highway Department v. Barnwell
Brothers, 303 U.S. 177 (1938).  The state does not traditionally
hold seized belongings for individuals once they are able to
claim them or provide for transfer to a third person.

This case is similar to Rendell-Baker and Santiago in one
other important respect.  In both Rendell-Baker and Santiago,
the State had only recently passed legislation authorizing
government involvement with the private service, leading courts
to reason that the service had not been traditionally performed
by the state.  Rendell-Baker, 457 U.S. at 831-32; Santiago, 655
F.3d at 70.  In this case, the statute allowing firearm
transfers to bonded warehouses is also relatively new, lending
further support to a holding that Village Gun Shop is not
performing a traditional government service, and is not a state
actor under the public function test.

### 4.    Joint Action Test

The final test for determining state action is the joint action test.  This test finds state action where a "private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a 'state actor.'"  Lugar, 457 U.S. at 941.  Again, this test speaks to a question of degree, and asks a court to determine what is "sufficient" joint participation.

Flagg Brothers Inc. v. Brooks, 436 U.S. 149 (1978), is instructive on this point.  Flagg Brothers operated a storage facility in New York City.  Id. at 153.  Brooks, the plaintiff, was evicted from her New York City apartment, and the city marshal arranged for her belongings to be stored at the Flagg Brothers facility.  Id.  Before the items were removed, Brooks was notified of the costs associated with the moving and storage of her belongings.  Id.  Brooks initially protested the cost and the storage, but ultimately assented to the transfer.  Id.  She continued to dispute the storage rates and refused to pay.  Id. Ultimately, Flagg Brothers notified her that she had ten days to remove her belongings, or pay the bill.  Id.  Under the circumstances, New York Uniform Commercial Code § 7-210 authorized Flagg Brothers to sell the items to recover unpaid storage fees.  Id.  Upon receiving notice, Brooks brought an

action seeking an injunction against the sale of the items and a
section 1983 claim alleging a violation of due process.   Id.

     The Supreme Court found an insufficient connection between
Flagg Brothers and the State, and held that Flagg Brothers was
not a state actor.   Id. at 166.   The Court stated that the
conflict was "a purely private dispute," and that the state
involvement was simply a "system of rights and remedies"
governing the dispute.   Id. at 160.   The Supreme Court pointed
out that Brooks had many lawful options that did not include the
sale of her belongings.   Id.

     Flagg Brothers can be distinguished from the present case
in that, in Flagg Brothers, the police never seized custody of
the disputed property, nor did the police have a statutory duty
to retain the property for any time.   Id.   The lack of police
involvement there reduced the interaction to one between private
parties.   The Owners, however, do not dispute the lawful nature
of the original seizure.   Therefore, the origin of the conflict
here are the fees charged by Village Gun Shop.   This is arguably
a dispute between a creditor and a debtor.   In this regard, the
present case is analogous to Flagg Brothers, and section 129D
simply governs the permissible action for a dispute of this
nature between private parties.

     The present case is analogous to Flagg Brothers because
like Brooks, the Owners may direct their property in many ways

19

that do not include the sale of the firearms.   436 U.S. 149; cf

Def.'s Mem. Opp'n 10-13.   The Owner's options include,

challenging the original seizure, retrieving the firearms from

the police before transfer to Village Gun Shop, transferring the

guns to a licensed third-party before transfer to Village Gun

Shop, retrieving the firearms from Village Gun Shop after

payment of fees, and continued storage at Village Gun Shop after

payment of fees.   Def.'s Mem. Opp'n 10-13.   State law creates

many avenues for resolving the concerns of the Owners, and

payment of fees was not the Owner's only option.

### c.    Towing and Impoundment Analogy

The Owners analogize to towing and impoundment cases in

which certain circuit courts have held that companies providing

towing and impoundment services are state actors.   Pls.' Mem.

10-11.   Although several federal courts have addressed the

question of state action in the tow and impoundment context, see

Smith v. Inskey's Inc., 499 F.3d 875 (8th Cir. 2007); Coleman v.

Turpen, 697 F.2d 1341 (10th Cir. 1982); Stypmann v. City &

County of San Francisco, 557 F.2d 1338 (9th Cir. 1977), the

First Circuit has not addressed the issue.   The Owners rely

heavily on the Ninth Circuit decision, Stypmann v. City & County

of San Francisco, in support of their argument.   557 F.2d 1338.

In Stypmann, state law authorized the towing and

impoundment of vehicles impeding traffic on city streets and

20

highways.  Id. at 1342.  The decision to tow a vehicle was at
the discretion of the police officer, and after the tow the
officer notified the owner and included the grounds for the tow
and the location of the car.  Id.  Once the car was towed the
owner became liable for the cost of the tow and storage.  Id.
The tow company also obtained an immediate lien against the
property for the costs.  Id.

        In the Ninth Circuit's brief discussion of state action,
the Court ruled "joint activity" existed between the police and
the tow and impound company, and held that the company was a
state actor.  Id.  Although the Owners analogize to this factual
situation in their brief, the relationship between the police
and the private companies here is distinctly different.  In
Stypmann the police were unable to accomplish the state's
purpose absent the action of the private company.  State law
authorized the police to have vehicles removed from public
roadways where their presence created a safety risk.  Id. at
1340.  The police, however, are unable to accomplish this goal
without the aid of a tow company.  Additionally, the size of the
seized property requires a large facility for storage, again
necessitating the joint action of the impound lot.  The police
cannot undertake the action without the joint action of the
private company.

In the present case the police do not require the assistance of Village Gun Shop to accomplish the State's goals. The police were able to seize the firearms with no assistance from Village Gun Shop.  Moreover, the police held the property for significant time with no assistance - over five months in Crampton's case.  The police required no action at all from Village Gun Shop to effect the seizure.  This distinction points up the significant divergence between the joint action present in Stypmann and the lack of joint action present in this case.

The Owners also cite Smith v. Inskey's Inc., 499 F.3d 875 (8th Cir. 2007), and Coleman v. Turpen, 697 F.2d 1341 (10th Cir. 1982), to support their argument.  Coleman and Smith also confront the issue of state action in the context of private towing and impoundment companies.  Both cases, however, deal with a factual situation separate from the one presented here. The properties seized in Coleman and Smith were seized in connection with a criminal investigation.  The Eighth Circuit in Smith reasoned that the tow company "was performing the traditional governmental function of seizing and securing property for a criminal investigation."  Smith, 499 F.3d at 880. Conversely, here the Owner's property was not seized or held by the police in connection with a criminal investigation.  The police only retain control of the firearms until they can be lawfully transferred out of their care.  This is not analogous

22

to the traditional government function of collection and
retention of evidence.

The analysis in Coleman is similar to that in Stypmann.  In
Coleman the Tenth Circuit focused on the joint action between
the police and the private company.  The court highlighted the
fact that the tow company was present throughout the entire
police action in regard to the property.  In the tow and impound
context the private company assists the police from start to
finish in the deprivation of property - put differently, it is
truly a joint action.  Unlike Coleman, Village Gun Shop does not
interact with the police until the property deprivation has
already occurred, and in some cases has been ongoing for quite
some time.  This case is not analogous to Coleman and there is
no joint action for the purposes of defining Village Gun Shop as
a state actor.

## V.   Conclusion

Village Gun Shop was not coerced by the government into
violating the Owner's rights, nor does it provide a traditional
public function.  Additionally, Village Gun Shop's actions do
not constitute a connection with state action sufficient to
warrant a holding that it is a state actor under the nexus or
joint function test.  The Court holds that Village Gun Shop is
not a state actor for the purposes of this section 1983 action.
Accordingly, the Owner's Motion for Partial Summary Judgment is

DENIED and summary judgment is GRANTED to Village Gun Shop.  The
Court has the undoubted authority to enter summary judgment
against the moving party pursuant to Federal Rule of Civil
Procedure 56(f)(1).  Judgment will enter in favor of Village Gun
Shop at the close of the case.


SO ORDERED.




                                        /s/ William G. Young

                                        William G. Young
                                          District Judge